**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**JAMES HYRE and HYRE & ASSOCIATES, LLC d/b/a HYRE PERSONAL WEALTH ADVISORS,**

**Plaintiffs,**

**v.**

**MARINER, LLC, MWA HOLDCO, LLC, MWA MIDCO, LLC, MARINER WEALTH ADVISORS, LLC and 1248 HOLDINGS, LLC,**

**Defendants.**

**Case No. 2:26-cv-02377-AJP-GEB**

**DEFENDANT MARINER, LLC AND MARINER WEALTH ADVISORS, LLC'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' FIRST AMENDED AND SUPPLEMENTAL COMPLAINT**

Defendant Mariner, LLC and Mariner Wealth Advisors, LLC (collectively, "Defendants") hereby answer or otherwise respond to Plaintiffs' First Amended and Supplemental Complaint as follows:

## STATEMENT OF THE CASE

Plaintiff Jim Hyre is a sophisticated businessperson with thirty years of experience. In mid-2024, Plaintiffs engaged an investment banker/broker, DeVoe & Company, to explore selling their company. Aryeh Malitzky of DeVoe & Company contacted Mariner, LLC to explore the company's interest in acquiring Plaintiff Hyre's wealth management firm. The parties began months of arms-length negotiations during which Plaintiff Hyre, through his counsel, sought and obtained nearly 500 revisions to the Asset Purchase Agreement between Plaintiffs and Mariner, LLC. Plaintiffs were well-represented during negotiations by their attorney, Aimee J. Jachym of Miller, Johnson, Snell & Cummisky, P.L.C., and by their investment banker/broker. Despite Plaintiff Hyre's sophistication and the quality of his advisors, Hyre now claims that he was tricked

into selling his company and seeks to enforce imagined oral statements allegedly made during the negotiation process. But the parties have a written agreement, negotiated by Hyre's lawyer, that does not include the terms Hyre now imagines. Further, upon closure of the acquisition, Hyre was difficult to work with, failed to grasp fairly simple details of the integration process, misled customers regarding the nature of the acquisition, disparaged Mariner to customers and others, and spent substantial time running his separate real estate business. These factors, and no others, led to his separation from Mariner.

**PARTIES**

1. Plaintiff James Hyre ("Plaintiff Hyre") is an individual and citizen of the State of Ohio, residing at 980 Elmwood Avenue, Columbus, Ohio 43212.

**ANSWER: Admitted.**

2. Plaintiff Hyre & Associates, LLC d/b/a Hyre Personal Wealth Advisors ("Plaintiff HPWA") is an Ohio based limited liability company, with its principal place of business located at 980 Elmwood Avenue, Columbus, Ohio 43212. Plaintiff Hyre is the sole member of Plaintiff HPWA.

**ANSWER: Admitted.**

3. Defendant Mariner, LLC is a domestic limited liability company, with its principal place of business located at 5700 W. 112th Street, Suite 500, Overland Park, Kansas 66211. Defendant Mariner, LLC, may be served with process through its registered agent, Corporation Service Company, at 1100 S.W. Wanamaker Rd. Suite 103, Topeka KS 66604. Defendant Mariner, LLC's sole member is Mariner Wealth Advisors, LLC. Defendant Mariner Wealth Advisors, LLC's sole member is Defendant MWA Midco, LLC, and Defendant MWA Midco, LLC's sole member is MWA Holdco, LLC. MWA Holdco, LLC, has various members.

**ANSWER: Admitted.**

4. Defendant MWA Holdco, LLC, is a limited liability company organized to do business under Delaware law. MWA Holdco, LLC's principal place of business is located at 5700 W. 112th St., Overland Park, Kansas 66211. Defendant MWA Holdco, LLC, has failed to maintain in this state a resident agent on whom service may be had and therefore may be served with process through the Kansas Secretary of State pursuant to K.S.A. § 60-304(f) and Rule 4(h).

**ANSWER: Defendants admit that MWA Holdco, LLC is organized under Delaware law but deny any obligation to register in Kansas.**

5. Defendant MWA Midco, LLC, conducts business in this state and is a limited liability company organized to do business under Delaware law. Defendant MWA Holdco, LLC, is the sole Member and Manager of MWA Midco, LLC. MWA Midco, LLC's principal place of business is located at 5700 W. 112th St., Overland Park, Kansas 66211. Defendant MWA Midco, LLC, has failed to maintain in this state a resident agent on whom service may be had and therefore may be served with process through the Secretary of State pursuant to K.S.A. § 60-304(f) and Rule 4(h). Defendant MWA Midco, LLC may also be served with process through its manager, MWA Holdco, LLC, pursuant to K.S.A. § 60-304(e) and Rule 4(h).

**ANSWER: Defendants admit that MWA Midco, LLC is organized under Delaware law but deny any obligation to register in Kansas.**

6. Defendant Mariner Wealth Advisors, LLC, is a for profit domestic limited liability company in good standing with its principal place of business located at 6320 S. Western Ave., Suite 100, Sioux Falls, South Dakota 57108. Defendant MWA Midco, LLC, is the Manager and sole Member of Defendant Mariner Wealth Advisors, LLC. Defendant Mariner Wealth Advisors, LLC, may be served with process through its registered agent, Corporation Service Company, at 1100 S.W. Wanamaker Rd. Suite 103, Topeka KS 66604. Defendant Mariner Wealth Advisors,

LLC, may also be served with process through MWA Midco, LLC, pursuant to K.S.A. § 60-304(e) and Rule 4(h).

**ANSWER: Denied.**

7. Defendant 1248 Holdings, LLC, f/k/a Bicknell Family Holding Company, LLC, is a foreign limited liability company in good standing organized to do business under Delaware law. Defendant 1248 Holdings, LLC may be served with process through its registered agent, Registered Agents Inc., at 4601 E. Douglas Ave. STE 150, Wichita KS 67218. Upon information and belief, Martin Bicknell owns more than 50% of 1248 Holdings, LLC's shares and serves as its manager.

**ANSWER: Denied.**

## JURISDICTION AND VENUE

8. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

**ANSWER: Admitted.**

9. This Court has personal jurisdiction over Defendants because each Defendant transacted business in Kansas, committed tortious acts in Kansas, and has contacts with Kansas that support jurisdiction consistent with the constitution of the United States.

**ANSWER: Defendants deny that any tortious act has been committed, in Kansas or otherwise, but admit that the Court has personal jurisdiction over them.**

10. This court has general personal jurisdiction over defendants because defendants are deemed citizens of each state where one or more of its members are located, and, if the member is itself an LLC, where each of the member-LLC's members are located. Upon information and belief, various members of MWA Holdco, LLC and 1248 Holdings, LLC — including Martin Bicknell — are residents of Kansas.

**ANSWER: Admitted.**

11. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) because one or more defendants reside in Kansas and all defendants are residents of the State of Kansas. Additionally, venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, specifically in Overland Park, Kansas at Mariner, LLC's headquarters.

**ANSWER: Admitted.**

**FACTS COMMON TO ALL COUNTS**

12. Plaintiff James Hyre is a personal wealth advisor that provides wealth management and investment advisory services.

**ANSWER: Defendants admit that, at the time of the asset purchase at issue in this case, Plaintiff Hyre was an investment advisor representative but lack sufficient information to form a belief as to the truth of the balance of Paragraph 12 and, therefore, deny same.**

13. Defendant Mariner, LLC is a financial services firm that provides inter alia wealth management and investment advisory services.

**ANSWER: Admitted.**

14. Prior to the events that form the basis of this case, Plaintiff Hyre was the principal and owner of Plaintiff HPWA. Plaintiff Hyre had spent the entirety of his adult life developing HPWA into a successful wealth management firm and had developed extensive positive client relationships with those whose assets Plaintiffs managed.

**ANSWER: Defendants admit that, at the time of the asset purchase at issue in this case, Hyre was the principal of HPWA. Defendants lack sufficient information to form a belief as to the balance of the facts alleged in Paragraph 14 and, therefore, deny them.**

15. In 2024, Plaintiff Hyre explored the potential of selling HPWA in order to continue HPWA's growth by expanding outreach to potential clients and realizing operational efficiencies through affiliation with a larger wealth management firm.

**ANSWER: Denied in Part. Defendants state that they were contacted by a representative of Plaintiffs in 2024 about the possibility of selling their business to Mariner. Defendants lack sufficient information to form a belief as to the balance of the facts alleged in Paragraph 15 and, therefore, deny them.**

16. Plaintiff Hyre met Defendant Mariner, LLC's business development recruiter Brian O'Regan who — acting within the course and scope of his employment — made several significant promises and representations to Plaintiff Hyre on behalf of Defendants in order to induce Plaintiff Hyre to sell HPWA to Defendants.

**ANSWER: Defendants admit that Mr. O'Regan was contacted by a representative of Plaintiffs about selling their company and that Mr. O'Regan provided information to Mr. Hyre and his representative regarding Mariner's business and its approach to the acquisition of wealth management firms. Defendants deny the balance of the allegations of Paragraph 16 of the First Amended and Supplemental Complaint.**

17. For example, Mariner, LLC agent and employee Brian O'Regan promised and represented that Plaintiff Hyre would be able to continue operating HPWA with autonomy as Plaintiff had successfully done for years — particularly that Plaintiff Hyre would be permitted to take whatever actions he saw fit, including hiring personnel and having full authority to invest clients in HPWA investment models without having to move client assets into Defendants' models.

**ANSWER: Denied.**

18. Defendants, through Mariner, LLC, agent and employee Brian O'Regan also promised and represented that — following the payment of the Management Incentive fee more fully described below — they would pay Plaintiff Hyre 35% for fees brought over by Plaintiffs Hyre and HPWA and an additional 25% for fees originated from Mariner client referrals.

**ANSWER: Denied.**

19. Defendants further promised and represented through Brian O'Regan that Plaintiff Hyre would be able to manage his client relationships in the same manner he had previously while operating HPWA.

**ANSWER: Defendants admit that Mr. Hyre would be able to manage his client relationships as he believed best and that the parties discussed this during negotiations, but Defendants deny any implication that he was prevented from doing so after he sold his business to Mariner.**

20. Defendants further promised and represented through Brian O'Regan that Plaintiff Hyre's compensation from fees would eventually increase to at the very least $1,500,000.00 per year after Plaintiff Hyre received his Management Incentive Program fee, as described more fully below.

**ANSWER: Denied.**

21. Brian O'Regan further promised and represented that Plaintiff Hyre would be able to significantly reduce his workload due to the support that Defendants would provide.

**ANSWER: Defendants admit that Mr. O'Regan shared with Mr. Hyre that, after the completion of the integration process, Mariner personnel would be available to handle the administrative elements of asset management but deny the balance of the allegations of Paragraph 21 of the First Amended and Supplemental Complaint.**

22. Based on Defendants' promises and representations, Plaintiff Hyre agreed to sell HPWA's assets to Mariner, LLC, under an asset purchase agreement in which Mariner, LLC would purchase substantially all of Plaintiff HPWA's assets.

**ANSWER: Defendants admit that they purchased substantially all of HPWA's assets but deny that they made representations to Plaintiff inconsistent with the Asset Purchase Agreement and deny the balance of the facts alleged in Paragraph 22 of the First Amended and Supplemental Complaint.**

23. The core asset of the Transaction is and was Plaintiff Hyre and HPWA's book of business — the assets under management and highly valuable client relationships that Plaintiff Hyre and HPWA expended great time, effort, and energy cultivating over the course of 32 years.

**ANSWER: Denied.**

24. Defendants comprise a national wealth management firm and have far more assets and resources than HPWA.

**ANSWER: Defendants admit that Mariner LLC is a registered investment advisor and that its assets under management exceeded those of HPWA at the time of the acquisition. Defendants deny the balance of the facts alleged in Paragraph 24 of the First Amended and Supplemental Complaint.**

25. In contemplating the potential transaction — and as is the customary practice in transactions of this nature in the wealth management industry — Plaintiff Hyre, Plaintiff HPWA, and Defendants agreed to a relationship whereby Plaintiff Hyre would continue to operate HPWA as he had successfully done previously and would be in charge of growing the central Ohio market.

**ANSWER: Defendants admit only that Plaintiff Hyre and Mariner personnel discussed Mr. Hyre continuing to act as the senior employee in his office but deny the balance of the allegations of Paragraph 25 of the First Amended and Supplemental Complaint.**

26. Plaintiff Hyre would operate HPWA as a Mariner branch, exercising the same autonomy over his client relationships and business strategy as he had always done.

**ANSWER: Denied in part. Defendants admit that, after the purchase of assets, HPWA employees became employees of Mariner Wealth Advisors, LLC and HPWA's assets would be managed by Mariner, LLC. Defendants further admit that Mr. Hyre continued to have the authority to manage client relationships as he saw fit provided, however, that he was truthful with clients, abided by the law and complied with company policies. Defendants lack information to form a belief as to Plaintiff's "business strategy for thirty years" and, therefore, deny that portion of Paragraph 26 of the First Amended and Supplemental Complaint.**

27. By selling HPWA's assets to Defendants, Plaintiff Hyre would maintain individual management of his book of business while obtaining access to Defendants' resources as large national wealth management firm.

**ANSWER: Defendants admit that, following the purchase of assets, Mr. Hyre continued to manage client relationships and admit that he had access to Mariner's resources, but deny any implication that he received representations during negotiations that were materially different from Mariner's post-purchase expectations.**

28. Defendants would likewise benefit by receiving a portion of the fees generated by Plaintiff Hyre and HPWA's book of business, and by increasing Defendants' geographical reach and assets under management.

**ANSWER: Defendants admit that Defendant Mariner, LLC would receive fees associated with the assets formally managed by HPWA but deny the balance of the allegations of Paragraph 28.**

29. Defendants represented and promised Plaintiff Hyre that HPWA would grow substantially through Schwab and Fidelity business referrals that Defendants would provide — referrals that Defendants ultimately failed to provide or initiate despite expressly representing to the contrary.

**ANSWER: Defendants admit that, after the completion of the integration process, and as explained to Mr. Hyre repeatedly, had the former HWPA office qualified to participate in the Schwab or Fidelity business referral programs, this could have a positive effect on the revenue generated by the office. Defendants deny the balance of the allegations of paragraph 29 of the First Amended and Supplemental Complaint.**

30. Similarly, Defendants represented and promised that Plaintiffs would oversee the central Ohio Market and that Defendants would supply Plaintiffs with several new advisors who would generate fees and assist in managing the new Schwab and Fidelity business referrals. Defendants promised and represented that a portion of the fees generated by these new advisors would accrue to Plaintiffs. Defendants' promises and representations were false because they never provided any new advisors and as a result the corresponding advisory fees never materialized.

**ANSWER: Defendants admit that Mariner, LLC benefits when offices that qualify for participation in a referral program successfully utilize that program, but Defendants deny that Plaintiff Hyre's office had yet qualified for any such program.**

31. On January 24, 2025, Plaintiff Hyre, Plaintiff HPWA, and Defendant Mariner, LLC (collectively the "Parties") signed a letter of intent ("LOI").

**ANSWER: Admitted.**

32. The LOI was signed on behalf of Mariner, LLC, by Martin Bicknell, Mariner, LLC's Chief Executive Officer and President as well as Cheryl Bicknell, Mariner, LLC's Chief Operating Officer.

**ANSWER: Defendants admit that they transmitted a letter of intent to Plaintiffs on January 24, 2025, but state that the document speaks for itself.**

33. The LOI summarized the principal terms of a completed transaction, whereby Mariner would acquire HPWA's assets and Plaintiff Hyre would continue to operate HPWA as a Mariner employee (the "Transaction").

**ANSWER: Defendants admit that they transmitted a letter of intent to Plaintiffs on January 24, 2025, but state that the document speaks for itself.**

34. The LOI contemplated a total purchase price of up to $39,000,000.00 for Mariner's acquisition of HPWA: "**Based on information we have received to date, we have valued [HPWA] at approximately $39,000,000 (the "Aggregate Purchase Price**")." (emphasis in original)

**ANSWER: Defendants admit that they transmitted a letter of intent to Plaintiffs on January 24, 2025, but state that the document speaks for itself.**

35. Under the LOI, $26,000,000.00 of the total purchase price would be paid by providing Plaintiff HPWA equity shares in Defendant MWA Holdco, LLC.

**ANSWER: Defendants admit that they transmitted a letter of intent to Plaintiffs on January 24, 2025, but state that the document speaks for itself.**

36. The remaining $13,000,000.00 would be paid three years after closing, based on three times HPWA's earnings growth.

**ANSWER: Defendants admit that they transmitted a letter of intent to Plaintiffs on January 24, 2025, but state that the document speaks for itself.**

37. Mariner employee Brian O'Regan promised and represented that starting in year four following the Transaction (i.e., after the Management Incentive was paid), Plaintiff Hyre's compensation from fees with Mariner would easily be over $1,500,000.00 based on Plaintiff Hyre receiving 35% of the management fees generated from HPWA business that was originated by

HPWA and 25% of management fees generated by HPWA business that was originated through Mariner referrals.

**ANSWER: Denied.**

38. The LOI expressly reaffirmed several material representations that Defendants had previously made to Plaintiffs to induce the Transaction, including (1) that Mariner, LLC, would facilitate expansive growth for HPWA growth through client referrals, including referrals through the Schwab Advisor Network ("SAN") and Fidelity's Wealth Advisor Solutions ("WAS"); (2) that Plaintiffs would continue to serve autonomously in advising clients and maintaining client relationships; (3) that Defendants would provide "extensive support via [Mariner's] internal Marketing, Regulatory Compliance & Legal, Finance & Billing, Operations, Human Resources and Technology teams, which furthers our goal of allowing our advisors to increase operating efficiency and focus on meeting client needs without distractions; (4) that Defendants had "significant experience in integrating new advisors, teams and offices[,]" and that Defendants "developed proven processes to help ensure the transition to Mariner is virtually seamless for clients and advisors."

**ANSWER: Defendants admit that Plaintiffs have accurately quoted some portion of the Letter of Intent but otherwise state that the document speaks for itself.**

39. For example, the LOI stated in part under Section 5, titled "Strategic Rationale and Plans" as follows:

> We envision that [HPWA's] client-facing team and client deliverables will remain intact. Mariner is actively engaged in day-to-day operations of all of our markets and centralizes many of the key back-office functions to support a focus on retaining clients and continued growth in our markets. [HPWA] will operate as part of Mariner with all of the tools and resources of the broader Mariner Organization in the background supporting the [HPWA] team to continue serving clients as their financial quarterback. Much like [HPWA], Mariner's goal is to continue to grow, both organically and inorganically, because we believe that a continued focus on growth allows us to create more opportunities for our clients and advisors as well as attract new talent to solidify the future of our organization for generations to

> come. Once integrated, we believe we can have a significant impact on [HPWA's] growth through the work of our dedicated business development professionals, the marketing support provided by our team at our headquarters, and especially through the access we will provide to the previously mentioned custodian referral partner programs.

**ANSWER: Defendants admit that Plaintiffs have paraphrased the Letter of Intent but state that the document speaks for itself.**

40. On March 20, 2025, the Parties entered into an asset purchase agreement to memorialize the Transaction.

**ANSWER: Admitted.**

41. On May 1, 2025, the Parties executed an amendment to the asset purchase agreement (collectively, the "APA").

**ANSWER: Defendants admit that Plaintiffs entered into a First Amendment to Asset Purchase Agreement dated Apri 30, 2025 but deny the balance of the allegations of Paragraph 41 of the First Amended and Supplemental Complaint.**

42. Under the APA, the total purchase price remained $39,000,000.00.

**ANSWER: Defendants state that the document speaks for itself.**

43. $25,000,000.00 of the purchase price would be paid to Plaintiff Hyre as equity in MWA Holdco, LLC, through class F units, and $1,000,000.00 would be paid in cash at closing. Plaintiff Hyre agreed to accept most of the purchase price in equity because his intent and understanding was that he would work with Defendants long term.

**ANSWER: Defendants state that the document speaks for itself.**

44. The remaining $13,000,000.00 would be paid out to Plaintiff Hyre as a management incentive ("Management Incentive") based on HPWA's earnings.

**ANSWER: Defendants state that the document speaks for itself.**

45. Specifically, three years post-close, Mariner would pay Plaintiff Hyre a cash sum equal to three times HWPA's [*sic*] annualized earnings up to $13,000,000.00 as a Management Incentive.

**ANSWER: Defendants state that the document speaks for itself.**

46. No portion of the APA makes Plaintiff Hyre's right to receive the Management Incentive contingent on Plaintiff Hyre's continued employment.

**ANSWER: Paragraph 40 contains a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants state that the document speaks for itself.**

47. Rather, the Management Incentive was expressly contemplated by the APA to be part of the purchase price for HPWA's assets: "For the avoidance of doubt, to the maximum extent permitted by law, the Management Incentive shall be treated as additional consideration for the acquired Purchased Assets[.]" This is consistent with the LOI, which listed the "Aggregate Purchase Price" for the Transaction as $39,000,000.00.

**ANSWER: Paragraph 41 contains a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants state that the document speaks for itself.**

48. The APA also included restrictive covenants against Plaintiff Hyre and Plaintiff HPWA including non-competition and non-solicitation provisions that purported to prohibit Plaintiffs from competing with Mariner for two years following the payment of the Management Incentive fee (i.e., prohibits competition until May 1, 2030).

**ANSWER: Defendants state that the document speaks for itself.**

49. As part of the Transaction, Plaintiff Hyre entered into an employment relationship with Defendant Mariner, LLC.

**ANSWER: Defendants admit that Mariner Wealth Advisors, LLC hired Plaintiff Hyre as an at will employee but deny the balance of the allegations of Paragraph 49.**

50. As part of that employment relationship Defendants paid Plaintiff Hyre a salary of $350,000.00 — a fraction of what Plaintiff Hyre was earning prior to the Transaction — on the understanding the Plaintiff Hyre's annual compensation would increase substantially following the payment of the Management Incentive as a result of Plaintiff Hyre receiving a portion HPWA's annual fees as described above.

**ANSWER: Defendants admit that Plaintiff's salary at Mariner was $350,000 but lacks information regarding Plaintiff Hyre's state of mind at closing, deny that Plaintiff Hyre would be paid twice for the book of business Mariner purchased via the asset purchase, and otherwise deny the balance of the allegations of Paragraph 50 of the First Amended and Supplemental Complaint.**

51. On May 1, 2025, the Transaction closed.

**ANSWER: Admitted.**

52. On May 2, 2025, Mariner required Plaintiff to execute a Non-Solicitation and Confidentiality Agreement (the "Non-Solicitation Agreement").

**ANSWER: Defendants admit that, as a Mariner employee, Plaintiff was required to execute a Non-Solicitation and Confidentiality Agreement.**

53. Among other things, the Non-Solicitation Agreement subjects Plaintiff Hyre to post-employment restrictive covenants for two years following his employment with Mariner.

**ANSWER: Defendants state that the document speaks for itself.**

54. One of these covenants is a customer non-solicitation provision and another is a noncompetition agreement.

**ANSWER: Defendants state that the document speaks for itself.**

55. This provision broadly prohibits Plaintiff Hyre from soliciting customers from Mariner for two years following the termination of Plaintiff Hyre's employment with Defendant Mariner, LLC, in addition to the terms of the APA which prohibit Plaintiff from the same conduct until five years after closing (i.e., May 1, 2030).

**ANSWER: Defendants state that the documents speak for themselves.**

56. Unfortunately, as explained below, it became clear that many of the representations made by Defendants turned out to be false, incorrect, or misleading and that from the beginning Defendants acted in bad faith to defraud Plaintiffs of the book of business for far less than it was worth.

**ANSWER: Denied.**

57. It was clear that Defendants had no intent to honor the terms of the LOI, the APA, the Management Incentive, or the representations it [sic] made to induce Plaintiffs into the Transaction.

**ANSWER: Denied.**

58. During the onboarding process, Defendants provided Plaintiff Hyre with a laptop computer.

**ANSWER: Defendants admit that, as a Mariner employee, it provided Plaintiff Hyer with a laptop computer to use for business purposes.**

59. Plaintiff Hyre provided Mariner, LLC, with his old laptop computer that he had purchased ("Personal Laptop"), so information could be ported from the Personal laptop [sic] onto the new device.

**ANSWER: Denied in part. Defendants admit that they acquired the computer identified in Paragraph 59 of the First Amended and Supplemental Complaint as a part of the assets of Plaintiffs. Further answering, Defendants deny that they authorized Plaintiff to provide Mariner with personal files, state that they advised Plaintiff not to transfer personal files to Mariner, state the Asset Purchase Agreement required Plaintiff to only transmit business-related files, and deny the balance of the allegations of Paragraph 59 of the First Amended and Supplemental Complaint.**

60. In providing Mariner, LLC, with his Personal Laptop, Plaintiff Hyre specifically informed Mariner, LLC, that he had personal information that he did not want to be transferred from the Personal Laptop to the Mariner Laptop.

**ANSWER: Defendants admit only that Plaintiff Hyre requested Mariner to transfer his personal files to Mariner's systems, but state that request was denied. Despite the denial of his request, Plaintiff appears to have included personal information in his upload of data onto a Dropbox account that he established and included personal information in the files he asked Mariner to transfer. Further answering, Defendants deny the balance of the allegations of Paragraph 60 of the First Amended and Supplemental Complaint.**

61. Despite this, Mariner, LLC, employee Barb Pruden informed Plaintiff Hyre that there was no time to do this and refused, and in the process of bringing all of the data from the Personal Laptop to the Mariner laptop Defendants wiped all of the data from Plaintiff Hyre's Personal Laptop.

**ANSWER: Denied.**

62. The information that was removed from the Personal Laptop and ported onto the Mariner Laptop included volumes of sensitive personal information that is critical to Plaintiff Hyre's personal life, including documents related to Plaintiff Hyre's family and finances.

**ANSWER: Defendants lack information to determine the truth of whether the personal information he uploaded to Dropbox and intermingled with business data was "sensitive" or "critical" to Plaintiff and, therefore, deny the allegations of Paragraph 62 of the First Amended and Supplemental Complaint.**

63. Following the Transaction closing, Plaintiff Hyre was working more than 85 hours per week on Mariner, LLC, matters despite being promised that he would be able to reduce his workload as a result of Mariner providing support.

**ANSWER: Denied.**

64. This large workload stemmed from Defendants' representations about providing support for HPWA and allowing HPWA to operate client relationships autonomously being false.

**ANSWER: Denied.**

65. HPWA's longstanding Chief Operating Officer Jen Ludowise quit shortly after the Transaction closed as a result of the chaotic, overburdensome work environment that Defendants' lack of support created.

**ANSWER: Denied.**

66. Many of Defendants' operating practices that were imposed on HPWA by Defendants — including Mariner, LLC's lack of bulk trading software like that which HPWA had successfully used in the past —were badly outdated and required significant hours to accomplish what were formerly simple tasks for HPWA.

**ANSWER: Denied.**

67. Mariner, LLC, agent and employee Brian O'Regan expressly and falsely represented to Plaintiffs that Defendant had access to bulk trading software when in fact Defendants did not have any such software.

**ANSWER: Denied.**

68. Additionally — in direct contradiction of the terms of the LOI, APA, and the Transaction — Defendants improperly intermeddled in Plaintiffs' management of HPWA's clients' assets by forcing Plaintiffs to push clients' assets into Defendants' investment models as opposed to Plaintiffs' own models that had long been used to manage client assets — resulting in many clients needlessly accruing large tax liabilities to their detriment.

**ANSWER: Denied.**

69. It also became clear that Defendants' representations that they had experience in transitions of the type contemplated by the Transaction were not true. For example, Defendants' represented to Plaintiff Hyre that they had integrated independent branch owners affiliated with Raymond James Financial Services — such as Plaintiffs — when Defendants had in fact never done so.

**ANSWER: Denied.**

70. In an attempt to assist with the massive workload generated by Ms. Ludowise's departure and Defendants' incompetence or unwillingness to assist Plaintiffs with a smooth transition, Plaintiff Hyre attempted to hire an additional advisor.

**ANSWER: Denied.**

71. However, Defendants prevented Plaintiff Hyre from hiring the advisor, even though Plaintiffs had been promised that they would retain personnel hiring authority so long as they remain within an allotted budget and even though ample funds were available to make the hire.

**ANSWER: Denied.**

72. Plaintiff Hyre had on three occasions requested to meet with Mariner, LLC's head of wealth management, Tony Roberts, to discuss Plaintiffs' concerns, to no avail.

**ANSWER: Denied.**

73. Plaintiffs' concerns included that Mariner had failed to initiate the client referrals as was promised and that Plaintiff Hyre was not permitted to run the office and the client relationships autonomously as was promised.

**ANSWER: Denied.**

74. With knowledge that Plaintiffs were frustrated with the misrepresentations made to Plaintiffs by Mariner — Bob Cole, Mariner, LLC's regional managing director, arranged to meet with Plaintiff Hyre about his concerns on October 27, 2025.

**ANSWER: Defendants admit only that Mr. Cole met with Plaintiff Hyre in October 2025 but deny that Plaintiffs asserted that they had received "misrepresentations" and deny the balance of the allegations of Paragraph 74 of the First Amended and Supplemental Complaint.**

75. Plaintiff Hyre had previously expressed to Mr. Cole on September 3, 2025, that Plaintiffs wanted to be Defendants' fastest growing acquisition ever and wanted to come up with

a plan to achieve strong growth for Defendants and a plan to work through Plaintiffs' concerns in good faith.

**ANSWER: Defendants admit that Plaintiff Hyre indicated that he wanted to come up with a plan to grow but deny the balance of the allegations of Paragraph 75 pf the First Amended and Supplemental Complaint.**

76. On October 26, 2025, Mr. Cole emailed Plaintiff Hyre stating that he would be bringing a human resources representative, Stacie Runion, to the meeting.

**ANSWER: Defendants admit that Stacie Runion attended the October meeting.**

77. Mr. Cole indicated that he wanted to get Plaintiffs' perspective on the Transaction and give Plaintiffs a chance to voice their concerns.

**ANSWER: Denied.**

78. Unbeknownst to Plaintiff, the October 27, 2025, meeting was not a good-faith effort at working through Plaintiffs' concerns.

**ANSWER: Defendants lack information regarding Plaintiff's state of mind about the October meeting and, therefore, deny this statement and deny the balance of the allegations of Paragraph 78.**

79. Rather, Mr. Cole and Ms. Runion informed Plaintiff Hyre that he was being terminated without providing any explanation to Plaintiff Hyre and without providing any sort of improvement plan, warning, or prior notice to Plaintiff Hyre.

**ANSWER: Denied.**

80. Plaintiff Hyre asked three times during the meeting why he was being terminated, and each time the Mariner, LLC, employees did not provide Plaintiff Hyre with an explanation for why he was being terminated.

**ANSWER: Denied.**

81. Ms. Runion stated that Mariner, LLC, was willing to offer Plaintiff Hyre a severance, but that Mariner, LLC, was unilaterally cancelling the Management Incentive — despite having no right to do so.

**ANSWER: Defendants admit that Ms. Runion discussed a negotiated severance arrangement with Plaintiff Hyre but deny the balance of the allegations of Paragraph 81 of the First Amended and Supplemental Complaint.**

82. Immediately upon Plaintiff Hyre's termination, Mariner, LLC, severed Plaintiff Hyre's access to Mariner's computer systems and took his Mariner laptop.

**ANSWER: Defendants admit that, as a former employee, Plaintiff Hyre did not have access to Mariner systems but deny the balance of the allegations of Paragraph 82 of the First Amended and Supplemental Complaint.**

83. Plaintiff Hyre specifically informed Mariner, LLC, employee Bob Cole on October 29, 2025, that he had personal information and data that Mariner had taken off of Plaintiff Hyre's Personal Laptop and that Plaintiff Hyre needed this information and data back.

**ANSWER: Defendants admit that Plaintiff Hyre stated that he had placed personal information on Mariner assets and inquired about its return. Defendants deny the balance of the allegations of Paragraph 83 of the First Amended and Supplemental Complaint.**

84. Mariner, LLC, offered to purchase Plaintiff Hyre's MWA Holdco, LLC equity — then worth $28,000,000.00 — for $25,000,000.00 and submit a Form U5 status of "Permitted to Resign" in exchange for Plaintiff signing a broad release of his legal claims against Defendants.

**ANSWER: Defendants admit that it offered to provide Plaintiff cash to redeem equity and otherwise admit that they provided Mr. Hyre a chance to resign his employment with Mariner Wealth Advisors, LLC, but deny the balance of the allegations of Paragraph 84 of the First Amended and Supplemental Complaint.**

85. By way of background, when a registered investment advisor separates from an investment firm, the firm files a public Form U5 filing.

**ANSWER: Defendants state that Paragraph 85 is a conclusion of law to which no response is required.**

86. The Form U5 is the official and public termination of the relationship between an advisor and the firm.

**ANSWER: Defendants state that Paragraph 86 is a conclusion of law to which no response is required.**

87. The Form U5 is a public facing document that clients, potential clients, and potential employers use to evaluate advisors. Form U5s are very difficult to expunge and are part of an advisor's permanent record.

**ANSWER: Defendants state that Paragraph 87 is a conclusion of law to which no response is required.**

88. A negative reason for separation on a U5 can have devastating effects on an advisor's ability to work and obtain new clients.

**ANSWER: Defendants lack information regarding the truth of Plaintiff's characterization of the impact of an accurate, but negative, U5 and, therefore, deny same.**

89. A "Permitted to Resign" designation in a Form U5 strongly suggests that an advisor was fired from their former firm.

**ANSWER: Defendants lack information regarding what conclusions a reader may draw from a U5 form noting that an employee was "permitted to resign" and, therefore, deny same.**

90. With longstanding clients trying to reach Plaintiff Hyre while Plaintiff Hyre was contemplating the offer, Plaintiff sought clarification from Mr. Cole on how to approach these clients.

**ANSWER: Denied.**

91. Plaintiff Hyre followed Mr. Cole's directive by instructing his clients to reach out to Doug Ramsey, a Mariner, LLC, advisor who had an established working relationship with Plaintiff Hyre.

**ANSWER: Defendants lack information regarding what information Plaintiff Hyre provided to clients and, therefore, deny the allegations of Paragraph 91 of the First Amended and Supplemental Complaint.**

92. Plaintiff Hyre came to learn that Mariner was telling clients that Plaintiff Hyre was having a difficult time having a boss and that the clients should not feel sympathy for Plaintiff Hyre because he has plenty of money.

**ANSWER: Defendants lack information regarding what Plaintiff "came to learn" and, therefore, deny the allegations of Paragraph 92 of the First Amended and Supplemental Complaint.**

93. Around 3:01 p.m. on October 29, 2025, Ms. Runion emailed Hyre to reiterate the terms of the severance offer.

**ANSWER: Defendants admit that they offered a negotiated severance agreement to Plaintiff Hyre but otherwise state that the document referenced in Paragraph 93 speaks for itself.**

94. However, several hours later, Mr. Cole emailed Plaintiff Hyre and revoked Mariner LLC's severance offer — including the offer to list "Permitted to Resign" on the U5.

**ANSWER: Defendants state that, had Plaintiff resigned in lieu of involuntary termination, they would have accurately characterized his separation as "permitted to resign," but otherwise state that the document speaks for itself.**

95. Mr. Cole claimed that "Mariner [had] received reliable information that [Plaintiff] may have materially violated [his] post-separation obligations to Mariner" and further falsely accused Plaintiff Hyre of breaching his fiduciary duty.

**ANSWER: Defendants state that the document speaks for itself.**

96. Plaintiff Hyre had done no such thing but was rather expressly telling HPWA clients to contact Mariner, LLC, as instructed.

**ANSWER: Defendants lack information sufficient to form a belief regarding the truth of the allegation contained in Paragraph 96 of the First Amended and Supplemental Complaint and, therefore, deny it.**

97. In the same email Mr. Cole informed Plaintiff Hyre that it was investigating this "reliable information[.]"

**ANSWER: Defendants state that the document speaks for itself.**

98. Over the next several weeks, Plaintiff Hyre's counsel sought answers from Mariner, LLC's counsel regarding the facts supporting the purported investigation into Plaintiff Hyre's alleged wrongdoing and the timeline for the investigation.

**ANSWER: Defendants state that settlement negotiations are confidential under Federal Rule of Evidence 408.**

99. During the same time period Plaintiff Hyre repeatedly reached out to Mariner, LLC, to obtain his personal information and data that were transferred to the Mariner laptop from his Personal Laptop.

**ANSWER: Denied.**

100. Mariner, LLC, agent and employee Stacie Runion emailed Plaintiff Hyre that she would work with IT to help Plaintiff obtain his personal information, but this never occurred.

**ANSWER: Denied.**

101. Finally, on November 25, 2025, at 6:50 p.m., Mariner, LLC's counsel, Chris Pace, provided a scattershot pretextual explanation for Plaintiff Hyre's termination.

**ANSWER: Defendants state that this is an improper attempt to reference a communication that is confidential under Federal Rule of Evidence 408, requires no response, and should be stricken. If it is not stricken, Defendants deny the allegations of Paragraph 101 of the First Amended and Supplemental Complaint.**

102. Mariner, LLC's counsel confirmed that Mariner had not "identified material violations of Mr. Hyre's non-compete and non-solicitation obligations."

**ANSWER: Defendants state that this is an improper attempt to reference a communication that is confidential under Federal Rule of Evidence 408, requires no response, and should be stricken.**

103. In other words, Mariner, LLC, was unable to support the baseless allegation that Plaintiff Hyre was preparing to compete as was the purported reason for terminating Plaintiff Hyre's employment and rescinding the severance offer.

**ANSWER: Denied.**

104. With no evidence to support Plaintiff Hyre's termination, Mariner, LLC, should have immediately rescinded the termination and allowed Plaintiff Hyre to continue working.

**ANSWER: Denied.**

105. Instead, Defendants were determined [sic] get out of the $13,000,000.00 obligation to Plaintiff Hyre — an obligation that had materially induced Plaintiff to sell HPWA's assets.

**ANSWER: Denied.**

106. To do this, Defendants invented three new and after-the fact pretextual reasons to continue justifying Plaintiff Hyre's termination.

**ANSWER: Denied.**

107. First, Mariner alleged that Plaintiff Hyre "was devoting substantial time to running a non-Mariner business from Mariner's facilities and on Mariner work times."

**ANSWER: Defendants admit that Plaintiff Hyre was devoting substantial time to running a non-Mariner business from a Mariner facility but deny that this is pretextual.**

108. The supposed basis for this allegation was the presence of documents related to Plaintiff Hyre's personal investments in the HPWA office — an office that Plaintiff Hyre had worked out of for decades.

**ANSWER: Denied.**

109. Outside of Mariner working hours, Plaintiff Hyre periodically checked his real estate investments as he had always done — activities disclosed and approved by Mariner as part of the Transaction. During Mariner business hours, Plaintiff was focused on Mariner work.

**ANSWER: Denied.**

110. These activities never materially detracted from Plaintiff Hyre's work responsibilities, and he was never told his performance was inadequate or that he was not completing his duties, quite the contrary: Plaintiff Hyre had taken on upwards of 85 hours per week because of Defendants failing to provide the promised support.

**ANSWER: Denied.**

111. The suggestion that the presence of documents related to Plaintiff Hyre's personal investing activities somehow interfered with his work obligations is unreasonable and factually unsupported.

**ANSWER: Denied.**

112. The second pretextual basis Mariner provided for Plaintiff's termination was that "in violation of Mariner's policies, the company has located a number of bottles of alcohol in [Plaintiff Hyre's] office."

**ANSWER: Denied.**

113. As an initial matter, Mariner, LLC, employee Mr. Cole had visited Plaintiff Hyre's office multiple times and saw the bottles as they were clearly displayed in the kitchen and nothing was ever mentioned by Mr. Cole or Defendants as those bottles being against company policy or otherwise problematic.

**ANSWER: Denied.**

114. As is customary in the wealth advising industry — which relies heavily on established interpersonal client relationships — Plaintiff would occasionally offer clients alcoholic beverages. For example, Plaintiff HPWA held wine and bourbon tastings for clients and prospective clients which resulted in bottles being present in HPWA's office — bottles that Mr.

Cole would have seen prior during his visits to the HPWA office prior to the Transaction being completed.

**ANSWER: Denied.**

115. Additionally, on information and belief, several advisors, agents, and employees in Mariner's 130+ offices have on occasion provided alcoholic beverages or had them present without suffering adverse employment consequences.

**ANSWER: Defendants deny that Plaintiff was terminated for "occasionally[] providing alcoholic beverages" and, therefore, deny the allegations of Paragraph 115 of the First Amended and Supplemental Complaint.**

116. In other words, terminating Plaintiff for something as customary as offering alcoholic beverages to clients in the wealth advising industry underscores the patently pretextual nature of this purported basis for Plaintiff's termination.

**ANSWER: Denied.**

117. In the third pretextual basis for Plaintiff's termination, Mariner alleged that Plaintiff Hyre negotiated an undisclosed side agreement between himself and former HPWA/then Mariner, LLC, employee named Phil Constans. Mariner, LLC, stated that the existence of this alleged side agreement violated Plaintiff Hyre's duties to Mariner in several respects, including failure to disclose, failure to convey unencumbered assets, failure to identify key contracts or commitments, and breach of representations and warranties.

**ANSWER: Denied.**

118. This purported basis for Plaintiff Hyre's termination is utterly false because not only was Mariner aware of an agreement between Plaintiff Hyre and Mr. Constans, Defendants' agent and employee Mr. Cole directed Plaintiff Hyre to negotiate this agreement.

**ANSWER: Denied.**

119. Mr. Constans was an older advisor and Defendants, acting through Mariner, LLC, employee Mr. Cole wanted to make room to hire a younger advisor who was motivated [sic] bring in new business.

**ANSWER: Denied.**

120. Ousting older advisors from acquired firms is something Martin Bicknell has admitted to in the context of Defendants' acquisition strategy:

> The number of firms looking to partner, looking to be sold is escalating […] It's because baby boomers are getting older so now they're looking for succession… The first one I would tell you [about why some firms are sold for different price to earnings ratios] is not growing next gen talent. That for us is definitely a multiple driver**. I mean, if there's a great young team inside these acquisitions, our acquisition strategy is about talent. If we're looking at an acquisition and the talent's not very deep, our multiple goes down, we'll typically transition those clients to a different team once they come over. For those teams that do have that next gen, we want that practice.**[1]

**ANSWER: Denied.**

121. Consistent with Mr. Martin Bicknell's statement that Defendants "transition" clients to new advisor teams when acquired firms have older advisors, Mr. Cole directed Plaintiff Hyre to induce Mr. Constans' retirement to make room for a younger advisor through any means necessary.

**ANSWER: Denied.**

122. In turn, Plaintiff Hyre offered to pay Mr. Constans a severance using Plaintiff Hyre's personal funds.

**ANSWER: Denied.**

---

[1] Marty Bicknell, Mariner: A Private Wealth Shipwright in Kansas, Investors First Podcast (at 37:05–38:13), https://www.investorsfirstpodcast.com/marty-bicknell-mariner-a-private-wealth-shipwright-in-kansas/. October 2, 2025.

123. In the same 6:20 p.m. November 25, 2025 email, after Defendants fabricated these pretextual reasons for terminating Plaintiff's employment in an attempt to defraud Plaintiff of the Management Incentive, Mariner's attorney stated that Plaintiff Hyre needed to agree to, among many other things, "terminate the Management Incentive as contemplated in the purchase agreement between Mariner and Mr. Hyre" by "mid-morning on November 26."

**ANSWER: Denied.**

124. This extremely short deadline was purportedly because the U5 filing was due on November 26, 2025.

**ANSWER: Denied.**

125. In an unmistakable display of the predatory, extortionate, and fraudulent character of Mariner's conduct toward Plaintiff Hyre, Mariner attorney Chris Pace expressly linked what Mariner would list on the U5 to Plaintiff Hyre accepting the one-sided offer and foregoing his entitlement to the Management Incentive:

> U-5. The U-5 must be filed no later than tomorrow (11.26.25). In connection with the proposal terms below, Mariner is willing to identify the reason for Mr. Frye's (sic) separation as "Permitted to Resign. Failure to meet performance expectations unrelated to security work."

**ANSWER: This paragraph improperly includes purported language from a confidential settlement communication, is improper and should be stricken. Defendants otherwise deny the allegations of Paragraph 125 of the First Amended and Supplemental Complaint.**

126. In other words, Defendants, though [sic] Mariner, LLC, are now making a thinly veiled threat that they intend to unlawfully file a false Form U5 concerning the circumstances of Plaintiff Hyre's departure from Mariner, LLC, but will settle on a slightly less damaging (but no more true) Form U5 so long as Plaintiff Hyre plays ball and accepts the grossly one sided terms.

**ANSWER: Denied.**

127. Mr. Hyre was not willing to agree to this false statement about the circumstances of his departure to be broadcast to the world as his departure in no way related to him failing to meet company expectations.

**ANSWER: Denied.**

128. Unable to extort agreement to the grossly one sided terms from Plaintiff Hyre, Mariner, LLC, made good on its threat and tarnished his reputation by filing a false Form U5 in violation of federal law stating that Plaintiff Hyre was "Discharged" for "Failure to meet company expectations unrelated to securities work."

**ANSWER: Denied.**

129. In sum, Mariner, LLC's post termination conduct toward Plaintiff Hyre powerfully illustrates the bad faith Defendants have harbored from the inception of the Transaction. At no point regarding the Transaction have Defendants acted in good faith.

**ANSWER: Denied.**

130. Defendants breached the promise to allow Plaintiffs to run the office autonomously.

**ANSWER: Denied.**

131. Defendants breached the promise regarding the revenue Plaintiffs would earn for moving business to Mariner (i.e., that Plaintiff Hyre would earn a portion of the fees generated by HPWA business).

**ANSWER: Denied.**

132. When Plaintiffs acted in good faith to resolve these concerns, Defendants summarily fired Plaintiff Hyre.

**ANSWER: Denied.**

133. In doing so, Defendants fabricated an allegation that Plaintiff Hyre was preparing to breach his non-solicitation and non-competition obligations— an allegation Defendants' attorney Chris Pace later admitted was unfounded in the November 26, 2025, email.

**ANSWER: Denied.**

134. When an investigation conducted by Defendants' own counsel failed to reveal any evidence supporting this allegation, Defendants remained determined to keep Plaintiffs' clients and not pay Plaintiff the $13,000,000.00 Management Incentive or any portion of fees generated by HPWA.

**ANSWER: Denied.**

135. In an attempt to do this, Defendants accused Plaintiff of conducting personal business on Mariner property — despite that other Mariner advisors engage in de minimis personal activity while on Mariner property.

**ANSWER: Denied.**

136. Defendants accused Plaintiff of possessing alcohol in violation of Mariner policy — despite other Mariner offices also containing alcohol and/or serving alcohol at client events and despite Mariner having actual knowledge of Plaintiff HPWA's possession of these bottles prior to entering into the Transaction.

**ANSWER: Denied.**

137. Defendants accused Plaintiff of surreptitiously engaging in a side deal — despite Defendants not only having full knowledge of this negotiation but having themselves directed Plaintiff, through Mr. Cole, to engage in this negotiation with Mr. Constans.

**ANSWER: Denied.**

138. There is no legal justification for Defendants' conduct.

**ANSWER: Denied.**

139. Each step taken by Mariner was done with the intent of (1) defrauding Plaintiffs of HPWA's assets including the book of business, (2) evading its obligations to Plaintiffs under the terms of the Transaction, and/or (3) unlawfully interfering with Plaintiffs' right to the Management Incentive.

**ANSWER: Denied.**

140. Defendants relied on flimsy pretextual justifications to avoid their obligations to Plaintiffs including but not limited to Plaintiff Hyre's reasonable and justified expectations to receive the $13,000,000.00 Management Incentive and the over $1,500,000.00 that Plaintiff Hyre was represented and promised to receive annually after the Management Incentive was paid.

**ANSWER: Denied.**

141. Defendants' conduct toward Plaintiffs complained of herein was and is willful, wanton, fraudulent, and malicious.

**ANSWER: Denied.**

142. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages, including but not limited to monetary damages, lost income, lost profits, consequential damages, special damages, loss of goodwill, loss of client relationships, loss of competitive advantage, and reputational damage.

**ANSWER: Denied.**

143. Among other damages, Plaintiff Hyre has refinancing obligations coming due on a number of personal commercial real estate investments that he will not be able to meet without the income and profits he reasonably expected to receive as a result of the Transaction. These commercial loans were specifically disclosed to Mariner while the Transaction was being contemplated and Mariner employee Brian O'Regan assured Plaintiff Hyre that Plaintiff Hyre would easily receive over $1,500,000.00 in compensation per year from Mariner as a result of

Plaintiff Hyre receiving a percentage of the fees generated by HPWA business following the payment of the Management Incentive.

**ANSWER: Denied.**

144. Plaintiff Hyre relied on this promise and representation to receive approval from his banks to sell HPWA, as his Mariner income prior to his receipt of the Management Incentive and the [sic] at least $1,500,000.00 in annual management fees was too low so as to constitute a breach of Plaintiff Hyre' [sic] covenant to the banks to maintain a minimum income level.

**ANSWER: Denied.**

145. Based on Defendants' promises and representations, Plaintiff Hyre's bank approved Plaintiff Hyre to sell HPWA on the understanding that Plaintiff Hyre was going to receive a substantial annual income following the payment of the Management Incentive.

**ANSWER: Denied.**

146. It was foreseeable from Defendants' perspective that the failure to pay Plaintiff Hyre the Management Incentive and failure to annually pay Plaintiff Hyre a percentage of fees generated by HPWA would result in Plaintiff Hyre being unable to meet his borrowing obligations.

**ANSWER: Denied.**

**The Court Should Pierce the Corporate Veil for Purposes of Vicarious Liability.**

147. In short, Martin Bicknell controls each of the defendants herein and ultimately each defendant operates for his benefit and subject to his control. In turn, Martin Bicknell operates as an agent and/or employee for each defendant herein and specifically operated as an agent and/or employee for each defendant herein with respect to the conduct complained of herein.

**ANSWER: Denied.**

148. At all relevant times Martin Bicknell was acting as an agent for and principal of Defendant Mariner, LLC, Defendant Mariner Wealth Advisors, LLC, Defendant MWA Midco,

LLC, MWA Holdco, LLC, and Defendant 1248 Holdings, LLC, including but not limited to signing the LOI.

**ANSWER: Defendants admit only that Mr. Bicknell had the authority to enter into an Asset Purchase Agreement on behalf of Mariner, LLC but otherwise deny the balance of the allegations of Paragraph 148 of the First Amended and Supplemental Complaint.**

149. Defendant Mariner, LLC, Defendant Mariner Wealth Advisors, LLC, Defendant MWA Midco, LLC, MWA Holdco, LLC, and Defendant 1248 Holdings, LLC, are liable for Martin Bicknell's conduct under agency principles and the doctrine respondeat superior.

**ANSWER: Denied.**

150. At all relevant times, Defendant Mariner, LLC, had no mind, will, or existence of its own but was a mere alter ego, instrumentality, and agent of its sole shareholder Defendant Mariner Wealth Advisors, LLC.

**ANSWER: Denied.**

151. At all relevant times, Defendant Mariner Wealth Advisors, LLC, had no mind, will, or existence of its own but was a mere alter ego, instrumentality, and agent of its sole shareholder Defendant MWA Midco, LLC.

**ANSWER: Denied.**

152. At all relevant times, MWA Midco, LLC, had no mind, will, or existence of its own but was a mere alter ego, instrumentality, and agent of its sole shareholder MWA Holdco, LLC.

**ANSWER: Denied.**

153. In other words, Defendant Mariner, LLC, was at all times acting as a mere alter ego, instrumentality, and agent of MWA Holdco, LLC and MWA Holdco, LLC, is therefore

vicariously liable for Mariner, LLC's acts and omissions. It is evident that Mariner, LLC, was acting as MWA Holdco, LLC's agent with respect to the Transaction in part because $25,000,000.00 dollars of the purchase price was paid in nonvoting equity shares in MWA Holdco, LLC, even though MWA Holdco, LLC, was not formally a party to the Transaction. MWA Holdco, LLC, ostensibly had nothing to gain from the transaction were it not for the unity of interests and common control between MWA Holdco, LLC, and Mariner, LLC. Stated differently, it would be utterly irrational for MWA Holdco, LLC, to gift Mariner, LLC, $25,000,000.00 to purchase assets if they were truly separate entities.

**ANSWER: Denied.**

154. Ultimately, Mariner, LLC, Mariner Wealth Advisors, LLC, and MWA Midco, LLC's, corporate funds are siphoned by MWA Holdco, LLC, through the sole shareholder of each entity.

**ANSWER: Denied.**

155. Ultimately, Mariner, LLC, Mariner Wealth Advisors, LLC, and MWA Midco, LLC, are used as facades for the operations of MWA Holdco, LLC.

**ANSWER: Denied.**

156. At all relevant times, 1248 Holdings, LLC f/k/a Bicknell Family Holding Company, LLC, was a mere alter ego and instrumentality of its controlling shareholder Martin Bicknell.

**ANSWER: Denied.**

157. Upon information and belief, Martin Bicknell has a controlling interest in 1248 Holdings, LLC, and serves as its manager.

**ANSWER: Admitted in part and denied in part. Defendants admit that Martin C. Bicknell is designated as the Manager of the 1248 Holdings, LLC and, in that capacity, has**

**the management authority granted to the Manager under the Company's limited liability company agreement but deny that Martin C. Bicknell individually owns a "controlling interest" in the Company.**

158. At all relevant times and for all relevant purposes herein Martin Bicknell was acting as an agent and/or principal of 1248 Holdings, LLC.

**ANSWER: Defendants admit only that Mr. Bicknell has the authority as manager granted to him under 1248 Holdings, LLC limited liability company agreement.**

**<u>COUNT I – BREACH OF CONTRACT</u>**

**By Plaintiffs Hyre and HPWA against all Defendants**

159. Plaintiffs incorporate by reference all other paragraphs of this complaint as though fully set forth herein.

**ANSWER: Defendants incorporate their responses to all prior paragraphs as if fully set forth herein.**

160. Plaintiffs and Mariner, LLC, entered into a valid and enforceable contract for the sale of HPWA's assets to Defendant Mariner, LLC.

**ANSWER: Admitted.**

161. Plaintiffs performed under the contract by conveying HPWA's assets to Mariner, LLC.

**ANSWER: Defendants admit that HPWA conveyed assets to Defendants in accordance with the asset purchase agreement. Defendants deny that Plaintiff otherwise performed all obligations under this agreement.**

162. A material term of the contract for the sale of HPWA's assets to Mariner, LLC, was that Plaintiff would be entitled to the Management Incentive.

**ANSWER: Defendants state that the asset purchase agreement speaks for itself.**

163. Nothing in the contract for the sale of HPWA to Mariner, LLC, made Plaintiff's right to receive the Management Incentive contingent upon his continued employment.

**ANSWER: Defendants state that the asset purchase agreement speaks for itself.**

164. Mariner, LLC, unambiguously informed Plaintiff that it would not pay him the Management Incentive upon his termination and has thereby breached its contract with Plaintiff.

**ANSWER: Denied.**

165. Alternatively, if the Court determines that Plaintiff's entitlement to the Management Incentive was contingent upon Plaintiff's continued employment with Mariner, LLC, then Mariner, LLC, and Plaintiff entered into a contract for employment for a term, and Mariner, LLC, breached the contract by terminating Plaintiff without cause.

**ANSWER: Denied.**

166. Mariner, LLC's breach of contract has directly and proximately caused Plaintiffs to suffer damages, including but not limited to monetary damages, lost income, lost profits, consequential damages, special damages, loss of goodwill, loss of client relationships, and loss of competitive advantage.

**ANSWER: Denied.**

**WHEREFORE, Defendants request this Court dismiss Count I of Plaintiffs' First Amended and Supplemental Complaint with prejudice, enter judgment in favor of Defendants, award Defendants their attorneys' fees and costs, and for any further relief the Court deems just and proper.**

## COUNT II – FRAUD

**By Plaintiffs Hyre and HPWA against all Defendants**

167. Plaintiffs incorporate by reference all other allegations contained in this complaint as though fully set forth herein.

**ANSWER: Defendants incorporate their responses to all prior paragraphs as if fully set forth herein.**

168. Defendants made representations of material fact that were known to be false or untrue, or were recklessly made without knowledge concerning the representation in at least one or more of the following respects:

a. Defendants, through their agent and employee Brian O'Regan, represented that Plaintiff Hyre would be able to continue operating HPWA with autonomy;

b. Defendants , through their agent and employees Martin Bicknell and Cheryl Bicknell, in the LOI represented that Plaintiff Hyre would be able to continue operating HPWA with autonomy;

c. Defendants , through their agent and employee Brian O'Regan, represented that Plaintiff Hyre would be able to continue to manage client relationships with autonomy;

d. Defendants, through their agent and employees Martin Bicknell and Cheryl Bicknell, in the LOI represented that Plaintiffs would be able to continue to manage client relationships with autonomy;

e. Defendants through their agent and employee Brian O'Regan represented that Plaintiffs would have continued employment with Mariner, LLC, following HPWA's assets being conveyed to Mariner, LLC;

f. Defendants, through their agents and employees Martin Bicknell and Cheryl Bicknell, in the LOI represented that Plaintiff would have continued employment with Mariner, LLC, following HPWA's assets being conveyed to Defendant Mariner, LLC;

g. Defendants, through their agent and employee Brian O'Regan, represented to Plaintiff Hyre that Mariner would pay Plaintiff Hyre 35% of HPWA's annual fees originated by Plaintiffs and 25% of HPWA annual fees originated by Defendants following Plaintiff Hyre's receipt of the Management Incentive;

h. Defendants, through their agent and employee Brian O'Regan, represented that Plaintiff Hyre's compensation from fees at Mariner would increase to at least $1,500,000.00 annually following Plaintiff Hyre's receipt of the Management Incentive.

i. Defendants, through their agent and employee, Brian O'Regan represented that Plaintiff Hyre would easily receive the full $13,000,000.00 Management Incentive;

j. Defendants, through their agents and employees Brian O'Regan, Martin Bicknell, and Cheryl Bicknell, represented that Defendants would help grow HWPA [*sic*] substantially through client referrals; and/or

k. Defendants, through their agents and employees Martin Bicknell and Cheryl Bicknell, represented to Plaintiffs in the LOI that Mariner was experienced in transitions of the type contemplated by the Transaction and that the transition of HPWA into a Mariner office would be a smooth transition.

**ANSWER: Denied.**

169. Each of these representations were intentionally made for the purpose of inducing Plaintiffs to act on them.

**ANSWER: Denied.**

170. Plaintiffs reasonably relied and acted upon these representations by, among other things, entering into the Transaction and foregoing the sale of HPWA's assets to a different entity.

**ANSWER: Denied.**

171. Defendants' fraud complained of herein proximately caused Plaintiff to sustain damages including but not limited to monetary damages, lost income, lost profits, consequential damages, special damages, loss of goodwill, loss of client relationships, and loss of competitive advantage.

**ANSWER: Denied.**

**WHEREFORE, Defendants request this Court dismiss Count II of Plaintiffs' First Amended and Supplemental Complaint with prejudice, enter judgment in favor of Defendants, award Defendants their attorneys' fees and costs, and for any further relief the Court deems just and proper.**

## COUNT III – NEGLIGENT MISREPRESENTATION

**By Plaintiffs Hyre and HPWA against Defendant Mariner**

172. Plaintiffs incorporate by reference all other allegations contained in this complaint as though fully set forth herein.

**ANSWER: Defendants incorporate their responses to all prior paragraphs as if fully set forth herein.**

173. Defendants, in the course of their business, supplied false information for the guidance of Plaintiffs in Plaintiffs' business transactions in one or more of the following respects:

a. Defendants, through their agent and employee Brian O'Regan, represented that Plaintiff Hyre would be able to continue operating HPWA with autonomy;

b. Defendants, through their agent and employees Martin Bicknell and Cheryl Bicknell, in the LOI represented that Plaintiff Hyre would be able to continue operating HPWA with autonomy;

c. Defendants, through their agent and employee Brian O'Regan, represented that Plaintiff Hyre would be able to continue to manage client relationships with autonomy;

d. Defendants, through their agent and employees Martin Bicknell and Cheryl Bicknell, in the LOI represented that Plaintiffs would be able to continue to manage client relationships with autonomy;

e. Defendants through their agent and employee Brian O'Regan represented that Plaintiffs would have continued employment with Mariner, LLC, following HPWA's assets being conveyed to Mariner, LLC;

f. Defendants, through their agents and employees Martin Bicknell and Cheryl Bicknell, in the LOI represented that Plaintiff would have continued employment with Mariner, LLC, following HPWA's assets being conveyed to Defendant Mariner;

g. Defendants. through their agent and employee Brian O'Regan, represented to Plaintiff Hyre that Mariner would pay Plaintiff Hyre 35% of HPWA's annual fees originated by Plaintiffs and 25% of HPWA annual fees originated by Defendants following Plaintiff Hyre's receipt of the Management Incentive;

h. Defendants, through their agent and employee Brian O'Regan, represented that Plaintiff Hyre's compensation from fees at Mariner would increase to at least $1,500,000.00 annually following Plaintiff Hyre's receipt of the Management Incentive.

i. Defendants, through their agent and employee, Brian O'Regan represented that Plaintiff Hyre would easily receive the full $13,000,000.00 Management Incentive;

j. Defendants, through their agents and employees Brian O'Regan, Martin Bicknell, and Cheryl Bicknell, represented that Defendants would help grow HWPA [*sic*] substantially through client referrals; and/or

k. Defendants, through their agents and employees Martin Bicknell and Cheryl Bicknell, represented to Plaintiffs in the LOI that Mariner was experienced in transitions of the type contemplated by the Transaction and that the transition of HPWA into a Mariner office would be a smooth transition.

**ANSWER: Denied.**

174. Defendants failed to exercise reasonable care or competence in obtaining this information and/or communicating this information to Plaintiffs.

**ANSWER: Denied.**

175. Plaintiffs reasonably relied upon this information and were the ones for whose benefit and/or guidance this information was supplied.

**ANSWER: Denied.**

176. As a result, Plaintiffs were proximately caused to suffer damages — including but not limited to monetary damages, lost income, lost profits, consequential damages, special damages, loss of goodwill, loss of client relationships, and loss of competitive advantage — in a transaction that Defendants intended to influence, namely the Transaction.

**ANSWER: Denied.**

**WHEREFORE, Defendants request this Court dismiss Count III of Plaintiffs' First Amended and Supplemental Complaint with prejudice, enter judgment in favor of Defendants, award Defendants their attorneys' fees and costs, and for any further relief the Court deems just and proper.**

## <u>COUNT IV – KANSAS UNIFORM TRADE SECRETS ACT</u>

**By Plaintiffs Hyre and HPWA against all Defendants**

177. Plaintiffs incorporate by reference all other allegations contained in this complaint as though fully set forth herein.

**ANSWER: Defendants incorporate their responses to all prior paragraphs as if fully set forth herein.**

178. K.S.A. § 60-3322(a), dealing with misappropriation of trade secrets, provides that a "complainant is entitled to recover damages for misappropriation."

**ANSWER: Paragraph 177 contains a statement of law to which no response is required. To the extent a response is deemed required, Defendants state that the statute speaks for itself.**

179. Defendants, through their misrepresentations, breach of contract, fraudulent conduct, and tortious conduct complained of herein, used improper means to misappropriate trade secrets within the meaning of the Kansas Uniform Trade Secrets Act, K.S.A. § 60-3320, et seq.

**ANSWER: Denied.**

180. Specifically, Plaintiffs' book of business constituted a "[t]rade secret" within the meaning of K.S.A. § 60-3320.

**ANSWER: Defendants state that Paragraph 180 is a legal conclusion to which no response is required.**

181. Defendants knew or had reason to know that the acquisition of the book of business was acquired by improper means.

**ANSWER: Denied.**

182. Defendants willfully and maliciously misappropriated the book of business through its knowing, intentional, fraudulent, and/or tortious conduct complained of herein.

**ANSWER: Denied.**

183. As a result, Plaintiffs were proximately caused to suffer damages including but not limited to monetary damages, lost income, lost profits, consequential damages, special damages, loss of goodwill, loss of client relationships, and loss of competitive advantage.

**ANSWER: Denied.**

**WHEREFORE, Defendants request this Court dismiss Count IV of Plaintiffs' First Amended and Supplemental Complaint with prejudice, enter judgment in favor of Defendants, award Defendants their attorneys' fees and costs, and for any further relief the Court deems just and proper.**

## COUNT V – DEFENSE OF TRADE SECRETS ACT

### By Plaintiffs Hyre and HPWA against all Defendants

184. Plaintiffs incorporate by reference all other allegations contained in this complaint as though fully set forth herein.

**ANSWER: Defendants incorporate their responses to all prior paragraphs as if fully set forth herein.**

185. 18 U.S.C. § 1836(b)(1) provides that "[a]n owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."

**ANSWER: Paragraph 185 is a statement of law to which no response is required. To the extent a response is deemed required, Defendants state that the statute speaks for itself.**

186. Defendants, through their misrepresentations, breach of contract, fraudulent conduct, and tortious conduct complained of herein, misappropriated trade secrets within the meaning of the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq.

**ANSWER: Denied.**

187. Specifically, Plaintiffs' book of business constituted a "trade secret" within the meaning of 18 U.S.C. 1839(3).

**ANSWER: Paragraph 187 is a statement of law to which no response is required. To the extent that a response is deemed required, Defendants state that the statue speaks for itself.**

188. Defendants knew or had reason to know that the acquisition of the book of business was acquired by improper means.

**ANSWER: Denied.**

189. Defendants willfully and maliciously misappropriated the book of business through their knowing, intentional, fraudulent, and/or tortious conduct complained of herein, and thus exemplary damages are warranted under 18 U.S.C. § 1836(b)(3)(C).

**ANSWER: Denied.**

190. As a result, Plaintiffs were proximately caused to suffer damages including but not limited to monetary damages, lost income, lost profits, consequential damages, special damages, loss of goodwill, loss of client relationships, and loss of competitive advantage.

**ANSWER: Denied.**

**WHEREFORE, Defendants requests this Court dismiss Count V of Plaintiffs' First Amended and Supplemental Complaint with prejudice, enter judgment in favor of Defendants, award Defendants their attorneys' fees and costs, and for any further relief the Court deems just and proper.**

## COUNT VI – COMPUTER FRAUD AND ABUSE ACT

### By Plaintiff Hyre against all Defendants

191. Plaintiff Hyre incorporates by reference all other allegations contained in this complaint as though fully set forth herein.

**ANSWER: Defendants incorporate their responses to all prior paragraphs as if fully set forth herein.**

192. 18 U.S.C. § 1030(g) provides in part that "Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief."

**ANSWER: Paragraph 192 is a statement of law to which no response is required. To the extent that a response is deemed required, Defendants state that the statue speaks for itself.**

193. Plaintiff Hyre's Personal Laptop constitutes both a "computer" and a "protected computer" within the meaning of 18 U.S.C. § 1030.

**ANSWER: Paragraph 193 is a conclusion of law to which no response is required. To the extent that a response is deemed required, Defendants state that the statue speaks for itself.**

194. Defendants intentionally accessed the Personal Laptop without authorization and/or exceeded authorized access within the meaning of § 1030(a)(2) and thereby obtained information from a protected computer within the meaning of §1030(a)(2)(C).

**ANSWER: Denied.**

195. Defendants knowingly and with intent to defraud accessed the Personal Laptop without authorization and/or exceeded authorized access and by means of such conduct furthered the intended fraud and obtained things of value, thereby violating §1030(a)(4).

**ANSWER: Denied.**

196. Defendants' violation(s) of 18 U.S.C. § 1030 caused loss to Plaintiff in excess of $5,000.00 including but not limited to monetary damages, lost income, lost profits, consequential damages, special damages, loss of goodwill, loss of client relationships, and loss of competitive advantage.

**ANSWER: Denied.**

**WHEREFORE, Defendants request this Court dismiss Count VI of Plaintiffs' First Amended and Supplemental Complaint with prejudice, enter judgment in favor of Defendants, award Defendants their attorneys' fees and costs, and for any further relief the Court deems just and proper.**

**COUNT VII – CONVERSION**

**By Plaintiff Hyre against all Defendants**

197. Plaintiff Hyre incorporates by reference all other allegations contained in this complaint as though fully set forth herein.

**ANSWER: Defendants incorporate their responses to all prior paragraphs as if fully set forth herein.**

198. In wiping all of the data from Plaintiff Hyre's Personal Laptop in the process of downloading the same without Plaintiff Hyre's consent, Defendants assumed or exercised the right of ownership over the Personal Laptop and that data contained on it.

**ANSWER: Denied.**

199. The Personal Laptop and Plaintiff Hyre's personal data that was wiped from it was Plaintiff Hyre's property.

**ANSWER: Denied.**

200. Defendants' continued possession of Plaintiff Hyre's personal data is and was without authorization by Plaintiff Hyre.

**ANSWER: Denied.**

201. Defendants' act of wiping all of the data from Plaintiff's Personal Laptop without Plaintiff Hyre's authorization has been to the exclusion of Plaintiffs' rights to the Personal Laptop and the data contained on it.

**ANSWER: Denied.**

202. As a proximate cause of Defendants' conversion of Plaintiff Hyre's Personal Laptop and the data contained on it, Plaintiff has suffered damages including but not limited to monetary damages, lost income, lost profits, consequential damages, special damages, loss of goodwill, loss of client relationships, and loss of competitive advantage.

**ANSWER: Denied.**

**WHEREFORE, Defendants request this Court dismiss Count VII of Plaintiffs' First Amended and Supplemental Complaint with prejudice, enter judgment in favor of Defendants, award Defendants their attorneys' fees and costs, and for any further relief the Court deems just and proper.**

## COUNT VIII – TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIP

**By Plaintiffs Hyre and HPWA against all Defendants**

203. Plaintiffs incorporate by reference all other allegations contained in this complaint as though fully set forth herein.

**ANSWER: Defendants incorporate their responses to all prior paragraphs as if fully set forth herein.**

204. Plaintiffs had an existing business relationship with the clients of HPWA, i.e., the book of business.

**ANSWER: Admitted.**

205. Defendants had knowledge of Plaintiffs' business relationship with Plaintiffs' clients.

**ANSWER: Admitted.**

206. But for the conduct of Defendants complained of herein, Plaintiffs were reasonably certain to have a continued a business relationship with Plaintiffs' clients.

**ANSWER: Denied.**

207. Defendants intentionally, unlawfully, and fraudulently engaged in misconduct that interfered with Plaintiffs' business relationship with Plaintiffs' clients.

**ANSWER: Denied.**

208. Defendants misconduct directly and proximately caused Plaintiffs to suffer damages, including but not limited to monetary damages, lost income, lost profits, consequential damages, special damages, loss of goodwill, loss of client relationships, and loss of competitive advantage.

**ANSWER: Denied.**

**WHEREFORE, Defendants request this Court dismiss Count VIII of Plaintiffs' First Amended and Supplemental Complaint with prejudice, enter judgment in favor of Defendants, award Defendants their attorneys' fees and costs, and for any further relief the Court deems just and proper.**

## COUNT IX – DECLARATORY JUDGMENT – INVALIDITY OF RESTRICTIVE COVENANTS

**By Plaintiffs Hyre and HPWA against Mariner, LLC**

209. Plaintiffs incorporate by reference all other allegations contained in this complaint as though set forth fully herein.

**ANSWER: Defendants incorporate their responses to all prior paragraphs as if fully set forth herein.**

210. 28 U.S.C. § 2201(a) provides in relevant part that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration whether or not further relief is or could be sought."

**ANSWER: Paragraph 210 is a statement of law to which no response is required. To the extent a response is deemed required, Defendants state that the statute speaks for itself.**

211. As a result of the Transaction, Plaintiffs have become subject to noncompetition and nonsolicitation obligations that prohibit Plaintiffs from competing with the business of Mariner, LLC.

**ANSWER: Admitted.**

212. Under Kansas law, noncompetition agreements are strictly construed against employers. *Weber v. Tillman*, 259 Kan. 457, 462 (1996). "A noncompetition covenant ancillary to an employment contract is valid and enforceable if the restraint is reasonable under the circumstances and not adverse to the public welfare." *Id*. Only "a legitimate business interest may be protected by a noncompetition covenant" and if "the sole purpose is to avoid ordinary competition, it is unreasonable and unenforceable." *Id*. (citing *Eastern Distributing Co. v. Flynn*, 222 Kan. 666, 670 (1977)). "The determination of reasonableness is made on the particular facts and circumstances of each case." *Weber*, 259 Kan. at 464. Relevant factors in accessing reasonableness include: "(1) Does the covenant protect a legitimate business interest of the employer? (2) Does the covenant create an undue burden on the employee? (3) Is the covenant injurious to the public welfare? (4) Are the time and territorial limitations contained in the covenant reasonable?" *Id*.

**ANSWER: Paragraph 212 contains statements of law to which no response is required.**

213. The noncompetition and nonsolicitation obligations so described are injurious to the public welfare because they unduly burden the clients' and public's interest in of choice of financial consultants.

**ANSWER: Denied.**

214. Defendant Mariner, LLC, has no legitimate business interest in the enforcement of noncompetition and nonsolicitation clauses against Plaintiffs because at all relevant times

Defendant Mariner, LLC, intended to defraud Plaintiffs of the book of business and intended to avoid ordinary competition through use of the noncompetition agreement and defamation of Plaintiff Hyre.

**ANSWER: Denied.**

215. Plaintiff Hyre, having been defrauded of his life's work, and with no means to make a comparable income, is currently and will continue to be unduly burdened by the noncompetition agreement.

**ANSWER: Denied.**

216. The noncompetition and nonsolicitation clauses are both territorially and temporarily overbroad: they are territorially unlimited and purport to prohibit Plaintiffs from competing with Mariner, LLC, until May 1, 2030.

**ANSWER: Denied.**

**WHEREFORE, Defendants request this Court dismiss Count IX of Plaintiffs' First Amended and Supplemental Complaint with prejudice, enter judgment in favor of Defendants, award Defendants their attorneys' fees and costs, and for any further relief the Court deems just and proper.**

## COUNT X – PROMISSORY ESTOPPEL

### By Plaintiffs Hyre and HPWA against all Defendants

217. Plaintiffs incorporate by reference all other allegations contained in this complaint as though set forth fully herein.

**ANSWER: Defendants incorporate their responses to all prior paragraphs as if fully set forth herein.**

218. By promising that Plaintiff Hyre would receive the full $13,000,000.00 Management Incentive, Defendants reasonably intended or expected Plaintiffs to act in reliance on the promise and Plaintiffs did in fact reasonably rely on that promise.

**ANSWER: Denied.**

219. By promising that Plaintiff Hyre's compensation would easily exceed $1,500,000.00 annually following the payment of the Management Incentive, Defendants reasonably intended or expected Plaintiffs to act in reliance on the promise and Plaintiffs did in fact reasonably rely on that promise.

**ANSWER: Denied.**

220. Plaintiffs reasonably relied on those promises by among other things entering into the Transaction and not selling to a different buyer.

**ANSWER: Denied.**

221. A refusal of the court to enforce these promises would sanction perpetration of fraud or result in other injustice including but not limited to allowing Defendants to obtain the book of business at far below its market value.

**ANSWER: Denied.**

**WHEREFORE, Defendants request this Court dismiss Count X of Plaintiffs' First Amended and Supplemental Complaint with prejudice, enter judgment in favor of Defendants, award Defendants their attorneys' fees and costs, and for any further relief the Court deems just and proper.**

## COUNT XI – DEFAMATION

### By Plaintiff Hyre against all Defendants

222. Plaintiff incorporates by reference all other allegations contained in this complaint as though set forth fully herein.

**ANSWER: Defendants incorporate their responses to all prior paragraphs as if fully set forth herein.**

223. Defendants — by and through their agent Defendant Mariner, LLC, — filed a public facing Form U5 stating that Plaintiff Hyre was terminated for “failure to meet company expectations unrelated to securities work.”

**ANSWER: Admitted.**

224. Defendants communicated these words to third persons, including the Securities and Exchange commission, the public at large, and potential employers of Mr. Hyre.

**ANSWER: Denied.**

225. Defendants knew it was false that Mr. Hyre was fired for failing to meet company expectations. Alternatively, Mariner acted in reckless disregard of the statement’s truth or falsity.

**ANSWER: Denied.**

226. This false statement has caused injury to Plaintiff’s reputation, including his career prospects as now anyone who views this U5 is given the false impression that Plaintiff Hyre failed to adequately perform his job functions.

**ANSWER: Denied.**

**WHEREFORE, Defendants request this Court dismiss Count XI of Plaintiffs’ First Amended and Supplemental Complaint with prejudice, enter judgment in favor of Defendants, award Defendants their attorneys’ fees and costs, and for any further relief the Court deems just and proper.**

## COUNT XII – AGE DISCRIMINATION IN EMPLOYMENT ACT

### By Plaintiff Hyre against All Defendants

227. Plaintiff incorporates by reference all other allegations contained in this complaint as though set forth fully herein.

**ANSWER: Defendants incorporate their responses to all prior paragraphs as if fully set forth herein.**

228. Plaintiff was born in 1969 and at all pertinent times was over 40 years of age.

**ANSWER: Defendant Mariner Weatlh Advisors, LLC admits the allegations of Paragraph 228 of the Complaint. Defendant Mariner, LLC lacks information to form a belief as to the birth year of Plaintiff but, on information and belief, admits that he was over 40 at the time of the closure of the asset purchase.**

229. Plaintiff's age makes him a member of a protected class.

**ANSWER: This is a statement of law to which no response is required. To the extent a response is deemed required, Defendants admit that the ADEA applies to individuals 40 and over.**

230. Plaintiff is a qualified individual within the meaning of the Age Discrimination in Employment Act ("ADEA").

**ANSWER: This is a statement of law to which no response is required. To the extent response is deemed required, Defendants state that they lack information to determine whether Plaintiff was qualified to perform the tasks expected of him but state that, regardless of qualification, Plaintiff did not perform his job functions in an acceptable fashion.**

231. On June 22, 2026, Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination on the basis of Plaintiff's age.

**ANSWER: Admitted.**

232. On July 6, 2026, the EEOC issued Plaintiff a Notice of Right to Sue.

**ANSWER: Admitted.**

233. This action has been timely filed within ninety (90) days of Plaintiff's receipt of the Notice to Sue.

**ANSWER: Admitted.**

234. Defendants are employers under the ADEA.

**ANSWER: Defendant Mariner Weatlh Adivsors, LLC admits that it employed Plaintiff. Defendant Mariner, LLC denies the allegations of Paragraph 234 of the Amended Complaint.**

235. Defendants unlawfully and intentionally discriminated against Plaintiff based on his age and acted in bad faith by interfering with, recklessly disregarding, and denying his legal rights.

**ANSWER: Denied.**

236. Plaintiff's age was the motivating factor in Defendants' decision to discriminate against Plaintiff and to terminate Plaintiff.

**ANSWER: Denied.**

237. Defendants' actions against Plaintiff were outrageous because Defendants had an evil motive and/or reckless indifference to the rights of others.

**ANSWER: Denied.**

238. As a direct and proximate result of Defendants' actions and/or omissions, Plaintiff has been deprived of income, including wages and benefits as well as other monetary and non-monetary benefits.

**ANSWER: Denied.**

239. By failing to take prompt and effective remedial action, Defendants condoned, ratified, and/or authorized the discrimination against Plaintiff.

**ANSWER: Denied.**

240. At all pertinent times mentioned herein, all agents, servants and employees of Defendants were at all times acting within the scope and course of their agency and employment, and/or their actions were expressly authorized by the Defendants, thus making Defendants liable for such actions.

**ANSWER: Denied.**

**WHEREFORE, Defendants request this Court dismiss Count XII of Plaintiffs' First Amended and Supplemental Complaint with prejudice, enter judgment in favor of Defendants, award Defendants their attorneys' fees and costs, and for any further relief the Court deems just and proper.**

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable. Pursuant to D. Kan. Rule 40.2(a), Plaintiffs request the trial be held in Kansas City, Kansas.

**ANSWER: Plaintiffs contractually have waived their right to a jury trial by entry into the Asset Purchase Agreement, their execution of the Non-Solicitation and Confidentiality Agreement, and by becoming a party to the MWA Hold LLC Agreement. Further, if the Parties' Asset Purchase Agreement were rescinded or invalidated, then the Parties' January 24, 2025 Letter of Intent, upon which Plaintiffs rely to assert their claims above, would operate to bar their right to a jury trial.**

**WHEREFORE, Defendants pray that the Court enter judgment in their favor and against Plaintiffs; for their costs incurred in the action; and for such other and further relief as the Court may deem just and proper under the circumstances.**

**DEFENDANTS' GENERAL DENIAL**

To the extent not expressly admitted herein, Defendants deny all allegations contained in Plaintiffs' First Amended and Supplemental Complaint.

**DEFENDANTS' AFFIRMATIVE AND OTHER DEFENSES**

Without assuming any burden of proof not otherwise imposed by law, Defendants assert the following defenses:

1. Plaintiffs' First Amended and Supplemental Complaint, in whole or in part, against Defendants fail to state a claim or cause of action for which relief may be granted.

2. Plaintiffs' claims against Defendants may be barred by the applicable statute of limitations for any actions that occurred outside the relevant time.

3. Plaintiffs' claims are barred because Defendants' actions were made in good faith and with reasonable grounds to believe that its conduct was in full compliance with the relevant laws.

4. Plaintiffs' recovery, if any, is subject to any applicable damages caps or limitations.

5. Plaintiffs' First Amended and Supplemental Complaint, in whole or in part, against Defendants are barred because the alleged actions of Defendants, which are denied, were not intentional, malicious, willful or reckless.

6. Defendants state Plaintiffs have failed to mitigate their damages, if any.

7. Plaintiffs' claims of conversion fail because Plaintiffs knowingly abandoned any documents or data Plaintiff Hyre left on the laptop computer purchased by Defendants at the time of acquisition and/or when he transferred data from the laptop to a Dropbox account he established for the purpose of transmitting business-related data to Defendants.

8. Plaintiffs' claims of conversion fail because Plaintiffs consented to the deposit of allegedly personal files on Mariner systems despite instructions not to do so.

9. Plaintiffs' contract claims are barred because they are not yet ripe and/or by the failure of one or more conditions precedent to have yet occurred.

10. Plaintiffs' promissory estoppel claims are barred because there is an enforceable contract between Plaintiffs and one or more defendant that addresses the subject matter of this claim.

11. Defendants expressly deny that they violated any duty of care to Plaintiffs but, if such a duty of care is found to be violated, Plaintiffs' own comparative fault bars and/or contributory negligence bars or reduces some or all of Plaintiffs' claims and alleged damages.

12. Plaintiffs' claims are barred, or their damages are reduced, by the doctrines of unjust enrichment, unclean hands, waiver, estoppel, accord and satisfaction; and release.

13. Plaintiffs' contract claims are barred because Plaintiffs received full payment.

14. Plaintiffs' claims are barred pursuant to the integration/merger clauses contained in the APA and other agreements between Plaintiffs and Defendants.

15. Plaintiffs' claims are barred because Plaintiffs' fraud claims are not independent of the APA.

16. Plaintiffs' claims under the Computer Fraud and Abuse Act are barred by their failure to meet the pleading requirements of Federal Rule of Civil Procedure 9.

17. Plaintiffs' claims under the Computer Fraud and Abuse Act are barred by their failure to sufficiently plead facts establishing losses of at least $5000.

18. Plaintiffs' claims under the Defend Trade Secrets Act fail because Hyre's "book of business" is not a "trade secret."

19. Plaintiffs' claims under the Defend Trade Secrets Act fail because Plaintiffs consented to the acquisition of the alleged trade secrets.

20. Plaintiff's claim of defamation is barred because the statement in the U5 identified by Plaintiff as the basis for his alleged defamation claim is the truth.

21. Plaintiff's claim of defamation is barred because he has not pled, nor can he prove, actual damages.

22. Plaintiffs' claims are barred, or their damages reduced, because their own acts or omissions constitute consent and/or waiver.

23. Plaintiffs' damages, if any, were not caused by Defendants.

24. Plaintiffs assumed the risk of their own actions.

25. If Plaintiffs have been damaged as alleged, which is denied, their damages have been caused by their own intentional or negligent acts or omissions, or by intentional or negligent acts or omissions of those other than Defendants, or for which Defendants are not responsible.

26. To the extent any unlawful conduct is found to have been committed by any agent of Defendants, Defendants should not be held liable because the conduct was outside the scope of the agent's employment, and the agent did not act with express or implied authority, and Defendants did not ratify or approve any unlawful conduct.

27. The actions taken by Defendants with respect to Plaintiffs were within the business judgment of Defendants.

28. Defendants did not breach any duty or obligation of any kind owed to Plaintiffs whether arising from common law, statute, contract or otherwise.

29. Plaintiffs' breach of contract claims are barred by the doctrine of mistake.

30. All employment actions taken regarding Plaintiff's employment were based on legitimate, non-discriminatory reasons.

31. Plaintiff cannot establish age as the "but for" cause of any challenged adverse employment action.

32. Plaintiff's claims for non-wage compensatory damages are barred because they are unavailable under the ADEA.

33. Even if Plaintiff were able to provide a violation of the ADEA, which Defendants expressly deny, Plaintiff would not be entitled to liquidated damages under 29 U.S.C. § 626(b) because any such violation was not a willful violation.

34. Defendants presently have insufficient knowledge or information on which to form a belief as to whether it may have additional, as yet unstated, affirmative or other defenses

available. Defendants reserve herein the right to assert additional defenses in the event that discovery indicates they would be appropriate.

35. Plaintiffs' claim should be dismissed because Plaintiffs' damages, if any, are too remote, speculative and de minimis to permit recovery.

36. Plaintiffs' claims are barred by the economic loss rule.

37. Defendants reserve the right to supplement and amend their affirmative and other defenses as warranted by the facts of the case, including but not limited to an after acquired evidence defense. Defendants affirmatively state that they will rely upon each and every affirmative defense or other avoidance provided by the Federal Rules of Civil Procedure or state law that may become known during the course of litigation, including discovery, trial, or otherwise.

WHEREFORE, Defendants request that the Court dismiss Plaintiffs' First Amended and Supplemental Complaint, enter judgment in Defendants; favor and against Plaintiffs, award Defendants their attorneys' fees and costs, and for any further relief the Court deems just and proper.

## COUNTERCLAIMS

Comes now Defendant/Counterclaimant Mariner, LLC (Mariner, Defendant, or Counterclaimant), and for its counterclaims against Plaintiffs/Counterclaim Defendants Jim Hyre and Hyre & Associates, LLC, states and alleges as follows:

## PARTIES

1. Counterclaimant Mariner, LLC ("Mariner") is a Kansas limited liability company, providing wealth management and investment advisory services.

2. Mariner is a citizen of the State of Kansas.

3. Mariner has its principal place of business located in Overland Park, Kansas.

4. Mariner is owned by Mariner Wealth Advisors, LLC, a citizen of Kansas.

5. Counterclaim-Defendant James G. Hyre ("Hyre") is an individual and citizen of the State of Ohio, residing at 980 Elmwood Avenue, Columbus, Ohio 43212.

6. Counterclaim-Defendant Hyre & Associates, LLC, d/b/a Hyre Personal Wealth Advisors ("HPWA"), is an Ohio limited liability company formerly engaged in the business of providing financial planning and investment management services.

7. HPWA is a citizen of the State of Ohio.

8. HPWA has its principal place of business located in 980 Elmwood Avenue, Columbus, Ohio 43212.

9. Upon information and belief, Hyre owns 100% of the membership interest in HPWA.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over the Counterclaims pursuant to 28 U.S.C. § 1367 because Counterclaim Plaintiff's claims against Counterclaim Defendants are part of the same case or controversy and arise from a common nucleus of operative fact as the claims plead in Counterclaim Defendant's Complaint.

11. Venue is proper in this Court.

## GENERAL ALLEGATIONS

12. In or about 2024, Hyre and HPWA (collectively "Plaintiffs") began exploring the potential sale of HPWA.

13. Hyre engaged DeVoe & Company, a consulting and investment banking firm, to contact potential buyers regarding the acquisition of HPWA.

14. DeVoe & Company and Plaintiffs/Counterclaim Defendants had initial discussions with Mariner that resulted in a non-binding indication of interest in October 2024 and a revised indication of interest in January 2025.

15. Through counsel, Plaintiffs/Counterclaim Defendants negotiated hundreds of changes to Mariner's initial proposed Asset Purchase Agreement.

16. On March 20, 2025, Mariner, HPWA, and Plaintiffs/Counterclaim Defendants entered into an Asset Purchase Agreement (the "APA") that, at Plaintiffs/Counterclaim Defendants' request, was later amended to provide Plaintiffs/Counterclaim Defendant Hyre with cash proceeds in addition to Mariner stock.

17. Under the Agreement, Mariner purchased substantially all of HPWA's assets, including HPWA's book of business.

18. The total maximum purchase price under the Agreement was $39,000,000.00, consisting of $25,000,000.00 in Class F equity units in Mariner, $1,000,000.00 in cash at closing, as well as the opportunity to earn between $0 and $13,000,000.00 in management incentive (the "Management Incentive"), payable based on HPWA's annualized earnings measured three years post-closing.

19. The transaction closed on April 30, 2025 at 11:59 p.m. CT, upon which Hyre became an employee of Mariner Wealth Advisors, LLC.

20. On May 2, 2025, as part of his employment with Mariner Wealth Advisors, Hyre executed a Non-Solicitation and Confidentiality Agreement (the "NSCA").

**Hyre's Contractual Obligations**

21. The Asset Purchase Agreement required Hyre to refrain from "any disparaging statement, either orally or in writing" regarding Mariner, its business, products, services, employees, or agents.

22. Section 5 of the NSCA also prohibits Hyre from disparaging Mariner, its employees or services.

23. Section 6.7 of the MWA Holdco LLC Agreement, to which Hyre is a party as a Class F member, prohibits members from disparaging Mariner.

24. Under Article 5 of the APA, Hyre and HPWA made representations concerning the completeness and accuracy of disclosures to Mariner.

25. Under Article 5 of the APA, Hyre and HPWA made representations that there were no liabilities or commitments not disclosed to Mariner prior to closing.

26. Under Article 5 of the APA, Hyre and HPWA made representations concerning his conveyance of unencumbered assets.

27. Under Articles 2.1, 2.2, and 7.11 of the APA, Hyre was contractually obligated to only transfer recent, business-related materials to Mariner systems, not personal files.

28. Under Article 13 of the APA, Hyre and HPWA agreed to indemnify Mariner for any breach of the representations, warranties, covenants, and agreements made by Hyre and HPWA in the Agreement.

**Failure to Disclose Side Agreement with Phil Constans**

29. Phil Constans ("Constans") was a financial advisor on Hyre's team at HPWA whose client relationships and book of business were included among the assets sold to Mariner in accordance with the APA.

30. Prior to or contemporaneous with the execution of the APA, Hyre entered into a side agreement with Constans pursuant to which Hyre agreed to pay Constans $100,000.00 upon Constans' planned retirement on December 31, 2025, plus additional deferred compensation payments totaling $372,000.00 to be paid between 2028 and 2031, with a 20% clawback provision if assets under management were lost before March 31, 2026.

31. This side agreement was not disclosed to Mariner prior to the closing of the asset purchase transaction.

32. Hyre did not disclose the existence of this side agreement to Mariner during due diligence, in the APA, or at any time prior to closing.

33. The side agreement created approximately $472,000.00 in liabilities encumbering assets that Mariner purchased, and Mariner has been exposed to potential claims by Constans arising from the arrangement.

**Disparagement of Mariner**

34. Beginning shortly after the transaction closed, Hyre began making disparaging statements about Mariner to clients, colleagues, and third parties.

35. For example, Hyre told clients that "Mariner is forcing him to raise fees on all clients."

36. Mariner's fees are, in fact, lower than those previously charged by HPWA.

37. Hyre also told clients that "Mariner is forcing me to use their investment strategy."

38. Hyre knew or should have known that Mariner authorizes advisors, like Hyre, to utilize custom investment strategies if they wish.

39. Hyre told clients "I didn't sell my business" and that Mariner was only handling his back-office work, both of which were untrue and confusing to clients.

40. Hyre told clients that the arrangement with Mariner was temporary.

41. Hyre made disparaging statements about Mariner to third parties outside the client base as well. For example, Hyre told two individuals that Mariner "stole" his business and "didn't pay [him] a dime" and that Mariner "changed the deal."

42. Hyre's statements in Paragraph 42 are false. Mariner paid him substantial consideration for the assets of HPWA and the only change to the asset purchase agreement after March 20, 2025 was made at Hyre's request and resulted in Mariner paying Hyre $1 million in cash at closing.

43. After his separation from Mariner on October 27, 2025, Hyre contacted clients and made additional false statements, including that he was "bringing his co-workers with him."

**Hyre's Impermissible Transfer of Personal Files to Mariner**

44. Plaintiff/Counterclaim Defendants were instructed to transfer only business-related files to Mariner.

45. The APA required Plaintiffs/Counterclaim Defendants to certify that they only transferred business-related files to Mariner.

46. Despite instruction and a contractual obligation not to do so, Plaintiffs/Counterclaim Defendants transferred personal files to Mariner systems.

**COUNT I**
**(BREACH OF CONTRACT, FAILURE TO DISCLOSE)**

47. Counterclaimant adopts and realleges the Paragraphs above as though fully set out herein.

48. The APA is a valid, enforceable contract.

49. Mariner met its obligation under the APA.

50. By failing to disclose the side agreement with Phil Constans, Plaintiffs breached the APA, including Article 5.

51. Plaintiffs' breach of contract has directly and proximately caused Counterclaimant to suffer damages, including monetary damages, in the amount Counterclaimant has undertaken Constans for Hyre's undisclosed side-agreement with him.

WHEREFORE, Mariner prays for judgment against Plaintiffs, for an award for compensatory damages in an amount to be proven at trial, prejudgment interest, costs, attorney's fees and such other relief as the Court deems just and proper.

## COUNT II
## (BREACH OF CONTRACT, IMPERMISSABLE TRANSFER OF PERSONAL FILES)

52. Counterclaimant adopts and realleges the Paragraphs above as though fully set out herein.

53. The APA is a valid, enforceable contract.

54. Counterclaim Defendant met its obligations under the APA.

55. Plaintiff/Counterclaim Defendants breached the APA by transferring or knowingly directing the transfer of personal files to Mariner systems.

56. This breach of contract has caused Counterclaim Plaintiff to incur costs in identifying and collecting those files for "return" to Counterclaim Defendant.

57. This breach has imposed legal jeopardy on Counterclaim Plaintiff via Counterclaim Defendants' assertions that Mariner impermissibly accessed and retained personal information.

WHEREFORE, Mariner prays for judgment against Plaintiffs, for an award for compensatory damages in an amount to be proven at trial, prejudgment interest, costs, attorney's fees and such other relief as the Court deems just and proper.

**COUNT III**
**(CONTRACTUAL INDEMNITY)**

58. Counterclaimant adopts and realleges the Paragraphs above as though fully set out herein.

59. The APA is a valid, enforceable contract.

60. Mariner met its obligation under the APA.

61. Plaintiffs/Counterclaim Defendants APA with Counterclaimant contains an express indemnity provision (Article 13) under which Plaintiffs agreed to indemnify and hold harmless Counterclaim from damages arising out of their breach of covenants, representations or warranties to Counterclaimant.

62. Plaintiffs' side-agreement with Constans violated several representations, covenants and warranties to Mariner as set out above.

63. Plaintiffs' breach of contract has directly and proximately caused Counterclaimant to suffer damages, including monetary damages of between $100,000 and $472,000, as a result of Counterclaimant's undertaking to pay Constans for Hyre's undisclosed side-agreement with him.

WHEREFORE, Mariner prays for judgment against Plaintiffs, for an award for compensatory damages in an amount to be proven at trial, prejudgment interest, costs, attorney's fees and such other relief as the Court deems just and proper.

**COUNT IV**
**(BREACH OF CONTRACTUAL OBLIGATION OF NON-DISPARAGEMENT)**

64. Counterclaimant adopts and realleges the Paragraphs above as though fully set out herein.

65. The APA is a valid, enforceable contract.

66. Section 12.4(d) of the APA provides that Plaintiffs were and are prohibited from making any disparaging statement, either orally or in writing, regarding Counterclaimant's business, products, services, employees or agents.

67. Pursuant to APA Section 12.4(g), Hyre acknowledged that any breach of Section 12.4 "may result in serious and irreparable injury to Purchaser" and that "Purchaser may not be adequately compensated by monetary damages alone."

68. Mariner met its obligation under the APA.

69. Plaintiff Hyre, in his personal capacity and as agent of Plaintiff Hyre & Associates LLC, disparaged Counterclaimant as described above in violation of their contractual obligations under the APA, the NSCA, and the MWA Holdco LLC Agreement.

70. Mariner has suffered damages as a direct and proximate result of Hyre's breaches of the APA, the NSCA, and the MWA Holdco LLC Agreement, including but not limited to: loss of client relationships and assets under management, attributable to client attrition caused by Hyre's disparaging statements; damage to Mariner's business reputation and goodwill among clients and in the financial services community; demoralization of Mariner employees in the Columbus, Ohio office; attorneys' fees and expenses incurred in connection with investigating Hyre's misconduct and prosecuting these counterclaims; and such other damages as may be proven at trial.

WHEREFORE, Mariner prays for judgment against Plaintiffs, for an award for compensatory damages in an amount to be proven at trial, prejudgment interest, costs, attorney's fees and such other relief as the Court deems just and proper.

Respectfully submitted,

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

/s/ *Chris R. Pace*
Chris R. Pace KS #17178
Michael L. Matula KS #18138
Alexandra G. Widick D. Kan #79303
700 W. 47th St., Suite 500
Kansas City, MO 64112
816-471-1301
816-471-1303 (Facsimile)
chris.pace@ogletree.com
michael.matula@ogletree.com
alexandra.widick@ogletree.com

**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 12th day of August 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and sent notification of such filing to the following:

W. Perry Brandt D. Kan #77842
Evan Rose KS #30648
SANDBERG PHOENIX & VON GONTARD, P.C.
4600 Madison Avenue, Suite 1000
Kansas City, MO 64112
Telephone: (816) 305-7377
pbrandt@sandbergphoenix.com
erose@sandbergphoenix.com

**ATTORNEYS FOR PLAINTIFFS**

/s/ *Chris R. Pace*
**ATTORNEY FOR DEFENDANT**