**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **JAMES HYRE and HYRE & ASSOCIATES, LLC D/B/A HYRE PERSONAL WEALTH ADVISORS**<br><br>**Plaintiffs.**<br><br>**v.**<br><br>**MARINER, LLC, et al.,**<br><br>**Defendants.** | ) | **Case No. 2:26-CV-02377-AJP-GEB** |

**PLAINTIFFS/COUNTERCLAIM DEFENDANTS JAMES HYRE AND HYRE & ASSOCIATES, LLC D/B/A/ HYRE PERSONAL WEALTH ADVISORS' ANSWER AND AFFIRMATIVE DEFENSES TO MARINER, LLC'S COUNTERCLAIM**

James Hyre and Hyre & Associates, LLC, d/b/a Hyre Personal Wealth Advisors (Collectively, "Plaintiffs/Counterclaim-Defendants") respectfully Answer Defendant Mariner, LLC's Counterclaim as follows:

## PARTIES

1. Counterclaimant Mariner, LLC ("Mariner") is a Kansas limited liability company, providing wealth management and investment advisory services.

**ANSWER: Admitted.**

2. Mariner is a citizen of the State of Kansas.

**ANSWER: Admitted.**

3. Mariner has its principal place of business located in Overland Park, Kansas.

**ANSWER: Admitted.**

4. Mariner is owned by Mariner Wealth Advisors, LLC, a citizen of Kansas.

**ANSWER: Plaintiffs/Counterclaim Defendants admit that Mariner, LLC's sole member is Mariner Wealth Advisors, LLC and that Mariner Wealth Advisors, LLC, is a citizen of Kansas. Except as expressly admitted, Plaintiffs/Counterclaim Defendants deny the allegations in Paragraph 4.**

5. Counterclaim-Defendant James G. Hyre ("Hyre") is an individual and citizen of the State of Ohio, residing at 980 Elmwood Avenue, Columbus, Ohio 43212.

**ANSWER: Admitted.**

6. Counterclaim-Defendant Hyre & Associates, LLC, d/b/a Hyre Personal Wealth Advisors ("HPWA"), is an Ohio limited liability company formerly engaged in the business of providing financial planning and investment management services.

**ANSWER: Admitted.**

7. HPWA is a citizen of the State of Ohio.

**ANSWER: Admitted.**

8. HPWA has its principal place of business located in 980 Elmwood Avenue, Columbus, Ohio 43212.

**ANSWER: Admitted.**

9. Upon information and belief, Hyre owns 100% of the membership interest in HPWA.

**ANSWER: Admitted.**

**JURISDICTION AND VENUE**

10. This Court has subject matter jurisdiction over the Counterclaims pursuant to 28 U.S.C. § 1367 because Counterclaim Plaintiff's claims against Counterclaim Defendants are part

of the same case or controversy and arise from a common nucleus of operative fact as the claims plead in Counterclaim Defendant's Complaint.

**ANSWER: Admitted.**

11. Venue is proper in this Court.

**ANSWER: Admitted.**

## GENERAL ALLEGATIONS

12. In or about 2024, Hyre and HPWA (collectively "Plaintiffs") began exploring the potential sale of HPWA.

**ANSWER: Admitted.**

13. Hyre engaged DeVoe & Company, a consulting and investment banking firm, to contact potential buyers regarding the acquisition of HPWA.

**ANSWER: Admitted.**

14. DeVoe & Company and Plaintiffs/Counterclaim Defendants had initial discussions with Mariner that resulted in a non-binding indication of interest in October 2024 and a revised indication of interest in January 2025.

**ANSWER: Plaintiffs/Counterclaim Defendants admit that Mariner, LLC, executed a January 24, 2025, letter of intent summarizing the principal terms of a completed transaction. Plaintiffs/Counterclaim Defendants lack sufficient information to form a belief as to the balance of the facts alleged in Paragraph 14 and therefore deny the same.**

15. Through counsel, Plaintiffs/Counterclaim Defendants negotiated hundreds of changes to Mariner's initial proposed Asset Purchase Agreement.

**ANSWER: Plaintiffs/Counterclaim Defendants admit that they were represented by counsel and that revisions were made to the Asset Purchase Agreement. Plaintiffs/Counterclaim**

**Defendants lack sufficient information to form a belief as to the balance of the facts alleged in Paragraph 15 and therefore deny the same.**

16. On March 20, 2025, Mariner, HPWA, and Plaintiffs/Counterclaim Defendants entered into an Asset Purchase Agreement (the "APA") that, at Plaintiffs/Counterclaim Defendants' request, was later amended to provide Plaintiffs/Counterclaim Defendant Hyre with cash proceeds in addition to Mariner stock.

**ANSWER: Admitted.**

17. Under the Agreement, Mariner purchased substantially all of HPWA's assets, including HPWA's book of business.

**ANSWER: Admitted.**

18. The total maximum purchase price under the Agreement was $39,000,000.00, consisting of $25,000,000.00 in Class F equity units in Mariner, $1,000,000.00 in cash at closing, as well as the opportunity to earn between $0 and $13,000,000.00 in management incentive (the "Management Incentive"), payable based on HPWA's annualized earnings measured three years post-closing.

**ANSWER: Admitted.**

19. The transaction closed on April 30, 2025 at 11:59 p.m. CT, upon which Hyre became an employee of Mariner Wealth Advisors, LLC.

**ANSWER: Paragraph 19 contains a legal conclusion to which no response is requires. To the extent a response is deemed required, admitted.**

20. On May 2, 2025, as part of his employment with Mariner Wealth Advisors, Hyre executed a Non-Solicitation and Confidentiality Agreement (the "NSCA").

**ANSWER: Paragraph 20 contains a legal conclusion to which no response is required. To the extent a response is deemed required, admitted.**

21. The Asset Purchase Agreement required Hyre to refrain from "any disparaging statement, either orally or in writing" regarding Mariner, its business, products, services, employees, or agents.

**ANSWER: Admitted.**

22. Section 5 of the NSCA also prohibits Hyre from disparaging Mariner, its employees or services.

**ANSWER: Admitted.**

23. Section 6.7 of the MWA Holdco LLC Agreement, to which Hyre is a party as a Class F member, prohibits members from disparaging Mariner.

**ANSWER: Plaintiffs/Counterclaim Defendants lack sufficient information to admit or deny the allegations in Paragraph 23 and therefore deny the same.**

24. Under Article 5 of the APA, Hyre and HPWA made representations concerning the completeness and accuracy of disclosures to Mariner.

**ANSWER: Admitted.**

25. Under Article 5 of the APA, Hyre and HPWA made representations that there were no liabilities or commitments not disclosed to Mariner prior to closing.

**ANSWER: Denied.**

26. Under Article 5 of the APA, Hyre and HPWA made representations concerning his conveyance of unencumbered assets.

**ANSWER: Denied.**

27. Under Articles 2.1, 2.2, and 7.11 of the APA, Hyre was contractually obligated to only transfer recent, business-related materials to Mariner systems, not personal files.

**ANSWER: Denied.**

28. Under Article 13 of the APA, Hyre and HPWA agreed to indemnify Mariner for any breach of the representations, warranties, covenants, and agreements made by Hyre and HPWA in the Agreement.

**ANSWER: Denied.**

29. Phil Constans ("Constans") was a financial advisor on Hyre's team at HPWA whose client relationships and book of business were included among the assets sold to Mariner in accordance with the APA.

**ANSWER: Admitted.**

30. Prior to or contemporaneous with the execution of the APA, Hyre entered into a side agreement with Constans pursuant to which Hyre agreed to pay Constans $100,000.00 upon Constans' planned retirement on December 31, 2025, plus additional deferred compensation payments totaling $372,000.00 to be paid between 2028 and 2031, with a 20% clawback provision if assets under management were lost before March 31, 2026.

**ANSWER: Plaintiffs/Counterclaim Defendants admit that Plaintiff Hyre personally paid Constans $100,000 to thank him for his years of service to HPWA and its clients in connection with Constans's retirement. Plaintiffs/Counterclaim Defendants deny that the $100,000 payment was a "side agreement" because Mariner employee Bob Cole expressly urged Hyre to do whatever it took, including paying Constans, to get him to retire so that Mariner could hire a younger advisor with an incentive to generate more business than Constans generated.**

**Except as expressly admitted, Plaintiffs/Counterclaim Defendants deny the allegations of Paragraph 30.**

31. This side agreement was not disclosed to Mariner prior to the closing of the asset purchase transaction.

**ANSWER: Denied.**

32. Hyre did not disclose the existence of this side agreement to Mariner during due diligence, in the APA, or at any time prior to closing.

**ANSWER: Denied.**

33. The side agreement created approximately $472,000.00 in liabilities encumbering assets that Mariner purchased, and Mariner has been exposed to potential claims by Constans arising from the arrangement.

**ANSWER: Denied.**

34. Beginning shortly after the transaction closed, Hyre began making disparaging statements about Mariner to clients, colleagues, and third parties.

**ANSWER: Denied.**

35. For example, Hyre told clients that "Mariner is forcing him to raise fees on all clients."

**ANSWER: Denied.**

36. Mariner's fees are, in fact, lower than those previously charged by HPWA.

**ANSWER: Denied.**

37. Hyre also told clients that "Mariner is forcing me to use their investment strategy."

**ANSWER: Admitted in part. Mariner repeatedly impressed upon Plaintiff/Counterclaim Defendant Hyre that Mariner wanted him to get all HPWA clients invested into Mariner**

**models over time. During the advisory relationship, Hyre expressed to some clients that Mariner wanted him to propose Mariner models. Except as expressly admitted, Plaintiffs/Counterclaim Defendants deny the allegations of Paragraph 37.**

38. Hyre knew or should have known that Mariner authorizes advisors, like Hyre, to utilize custom investment strategies if they wish.

**ANSWER: Denied.**

39. Hyre told clients "I didn't sell my business" and that Mariner was only handling his back-office work, both of which were untrue and confusing to clients.

**ANSWER: Denied.**

40. Hyre told clients that the arrangement with Mariner was temporary.

**ANSWER: Denied.**

41. Hyre made disparaging statements about Mariner to third parties outside the client base as well. For example, Hyre told two individuals that Mariner "stole" his business and "didn't pay [him] a dime" and that Mariner "changed the deal."

**ANSWER: Denied.**

42. Hyre's statements in Paragraph 42 (sic) are false. Mariner paid him substantial consideration for the assets of HPWA and the only change to the asset purchase agreement after March 20, 2025 was made at Hyre's request and resulted in Mariner paying Hyre $1 million in cash at closing.

**ANSWER: Plaintiffs/Counterclaim Defendants admit that consideration was exchanged for the acquired assets including $1,000,000. Plaintiffs/Counterclaim Defendants deny making the alleged statements in Paragraph 41. Except as expressly admitted, denied.**

43. After his separation from Mariner on October 27, 2025, Hyre contacted clients and made additional false statements, including that he was "bringing his co-workers with him."

**ANSWER: Denied.**

44. Plaintiff/Counterclaim Defendants were instructed to transfer only business-related files to Mariner.

**ANSWER: Denied.**

45. The APA required Plaintiffs/Counterclaim Defendants to certify that they only transferred business-related files to Mariner.

**ANSWER: Denied.**

46. Despite instruction and a contractual obligation not to do so, Plaintiffs/Counterclaim Defendants transferred personal files to Mariner systems.

**ANSWER: Denied.**

**COUNT I**
**(BREACH OF CONTRACT, FAILURE TO DISCLOSE)**

47. Counterclaimant adopts and realleges the Paragraphs above as though fully set out herein.

**ANSWER: Plaintiffs/Counterclaim Defendants incorporate their responses to all prior paragraphs.**

48. The APA is a valid, enforceable contract.

**ANSWER: Admitted.**

49. Mariner met its obligation under the APA.

**ANSWER: Denied.**

50. By failing to disclose the side agreement with Phil Constans, Plaintiffs breached the APA, including Article 5.

**ANSWER: Denied.**

51. Plaintiffs' breach of contract has directly and proximately caused Counterclaimant to suffer damages, including monetary damages, in the amount Counterclaimant has undertaken Constans for Hyre's undisclosed side-agreement with him.

**ANSWER: Denied.**

**WHEREFORE, Plaintiffs/Counterclaim Defendants pray the Court dismisses Count I of Mariner, LLC's Counterclaim with prejudice, enter judgment in favor of Plaintiffs/Counterclaim Defendants, award their attorneys' fees and costs, and for any further and more effective relief the Court deems just.**

**COUNT II**
**(BREACH OF CONTRACT, IMPERMISSIBLE TRANSFER OF PERSONAL FILES)**

52. Counterclaimant adopts and realleges the Paragraphs above as though fully set out herein.

**ANSWER: Plaintiffs/Counterclaim Defendants incorporate their responses to all prior paragraphs.**

53. The APA is a valid, enforceable contract.

**ANSWER: Admitted.**

54. Counterclaim Defendant met its obligations under the APA.

**ANSWER: Denied.**

55. Plaintiff/Counterclaim Defendants breached the APA by transferring or knowingly directing the transfer of personal files to Mariner systems.

**ANSWER: Denied.**

56. This breach of contract has caused Counterclaim Plaintiff to incur costs in identifying and collecting those files for "return" to Counterclaim Defendant.

**ANSWER: Denied.**

57. This breach has imposed legal jeopardy on Counterclaim Plaintiff via Counterclaim Defendants' assertions that Mariner impermissibly accessed and retained personal information.

**ANSWER: Denied.**

**WHEREFORE, Plaintiffs/Counterclaim Defendants pray the Court dismisses Count II of Mariner, LLC's Counterclaim with prejudice, enter judgment in favor of Plaintiffs/Counterclaim Defendants, award their attorneys' fees and costs, and for any further and more effective relief the Court deems just.**

**COUNT III**
**(CONTRACTUAL INDEMNITY)**

58. Counterclaimant adopts and realleges the Paragraphs above as though fully set out herein.

**ANSWER: Plaintiffs/Counterclaim Defendants incorporate their responses to all prior paragraphs.**

59. The APA is a valid, enforceable contract.

**ANSWER: Admitted.**

60. Mariner met its obligation under the APA.

**ANSWER: Denied.**

61. Plaintiffs/Counterclaim Defendants APA with Counterclaimant contains an express indemnity provision (Article 13) under which Plaintiffs agreed to indemnify and hold harmless Counterclaim from damages arising out of their breach of covenants, representations or warranties to Counterclaimant.

**ANSWER: Denied.**

62. Plaintiffs' side-agreement with Constans violated several representations, covenants and warranties to Mariner as set out above.

**ANSWER: Denied.**

63. Plaintiffs' breach of contract has directly and proximately caused Counterclaimant to suffer damages, including monetary damages of between $100,000 and $472,000, as a result of Counterclaimant's undertaking to pay Constans for Hyre's undisclosed side-agreement with him.

**ANSWER: Denied.**

**WHEREFORE, Plaintiffs/Counterclaim Defendants pray the Court dismisses Count III of Mariner, LLC's Counterclaim with prejudice, enter judgment in favor of Plaintiffs/Counterclaim Defendants, award their attorneys' fees and costs, and for any further and more effective relief the Court deems just.**

**COUNT IV**
**(BREACH OF CONTRACTUAL OBLIGATION OF NON-DISPARAGEMENT)**

64. Counterclaimant adopts and realleges the Paragraphs above as though fully set out herein.

**ANSWER: Plaintiffs/Counterclaim Defendants incorporate their responses to all prior paragraphs.**

65. The APA is a valid, enforceable contract.

**ANSWER: Admitted.**

66. Section 12.4(d) of the APA provides that Plaintiffs were and are prohibited from making any disparaging statement, either orally or in writing, regarding Counterclaimant's business, products, services, employees or agents.

**ANSWER: Admitted.**

67. Pursuant to APA Section 12.4(g), Hyre acknowledged that any breach of Section 12.4 "may result in serious and irreparable injury to Purchaser" and that "Purchaser may not be adequately compensated by monetary damages alone."

**ANSWER: Admitted.**

68. Mariner met its obligation under the APA.

**ANSWER: Denied.**

69. Plaintiff Hyre, in his personal capacity and as agent of Plaintiff Hyre & Associates LLC, disparaged Counterclaimant as described above in violation of their contractual obligations under the APA, the NSCA, and the MWA Holdco LLC Agreement.

**ANSWER: Denied.**

70. Mariner has suffered damages as a direct and proximate result of Hyre's breaches of the APA, the NSCA, and the MWA Holdco LLC Agreement, including but not limited to: loss of client relationships and assets under management, attributable to client attrition caused by Hyre's disparaging statements; damage to Mariner's business reputation and goodwill among clients and in the financial services community; demoralization of Mariner employees in the Columbus, Ohio office; attorneys' fees and expenses incurred in connection with investigating Hyre's misconduct and prosecuting these counterclaims; and such other damages as may be proven at trial.

**ANSWER: Denied.**

**WHEREFORE, Plaintiffs/Counterclaim Defendants pray the Court dismisses Count III of Mariner, LLC's Counterclaim with prejudice, enter judgment in favor of Plaintiffs/Counterclaim Defendants, award their attorneys' fees and costs, and for any further and more effective relief the Court deems just.**

## PLAINTIFFS/COUNTERCLAIM DEFENDANTS' GENERAL DENIAL

Except to the extent expressly admitted, Plaintiffs/Counterclaim Defendants deny all allegations contained in Mariner, LLC's Counterclaim.

## AFFIRMATIVE AND OTHER DEFENSES

Plaintiffs/Counterclaim Defendants assert the following affirmative and other defenses to Mariner, LLC's Counterclaims.

1. Mariner's Counterclaims, in whole or in part, fail to state a claim upon which relief can be granted.

2. Mariner's contractual indemnity claim for the alleged Constan's agreement fails because Defendant has suffered no damages.

3. Mariner's contractual indemnity claim alleged in connection with Hyre's computer files because Defendant has suffered no damages.

4. Mariner's contractual indemnity claims fail because Defendant has unclean hands.

5. The Non-Solicitation and Confidentiality Agreement fails to be supported by consideration because continued employment is not valid consideration for the restrictive covenants alleged.

6. Mariner's non-disparagement claim fails because the clause at issue vague, overbroad, and/or contrary to public policy.

7. Mariner's non-disparagement claim fails because enforcement under the circumstances would violate public policy including but not limited to chilling protected speech and chilling investment advisors' fiduciary duty to act in their clients and provide honest, unbiased financial advice.

8. Mariner's non-disparagement allegations are not plead with requisite specificity.

9. Mariner's claims are barred, or their damages reduced, because their own acts or omissions constitute consent and/or waiver.

10. Mariner's damages, if any, were not caused by Plaintiffs/Counterclaim Defendants.

11. Plaintiffs/Counterclaim Defendants did not breach any duty to Mariner.

12. If Mariner has suffered any damages, which is denied, their damages have been caused by their own acts or omissions, or by the acts or omissions of parties other than Plaintiffs/Counterclaim Defendants.

13. Mariner assumed the risk of its own actions.

14. Mariner's alleged damages are too speculative and/or remote to permit recover.

15. Mariner's claims are barred, or their damages are reduced, by the doctrines of fraud, illegality, unjust enrichment, and/or estoppel.

16. Plaintiffs/Counterclaim Defendants reserve the right to assert additional defenses that may become known during the course of litigation.

**JURY TRIAL DEMANDED**

Plaintiffs/Counterclaim Defendants demand a jury trial on all issues so triable.

SANDBERG PHOENIX & VON GONTARD, P.C.

By */s/ W. Perry Brandt*
W. Perry Brandt DKAN # 77842
Evan Rose KS # 30648
4600 Madison Avenue
Suite 1000
Kansas City, MO 64112
(816) 305-7377
pbrandt@sandbergphoenix.com
erose@sandbergphoenix.com

**CERTIFICATE OF SERVICE**

I hereby certify that on September 2, 2026, the foregoing was filed electronically with the Clerk of the Court using the CM/ECF filing system, which will send notice of such filing to all counsel of record who are registered CM/ECF users.

*/s/ W. Perry Brandt*